[Cite as *In re A.J.*, 2022-Ohio-3863.]

STATE OF OHIO        )               IN THE COURT OF APPEALS
                       )ss:           NINTH JUDICIAL DISTRICT
COUNTY OF LORAIN    )

IN RE: A.J.
     V.B.
     J.B.
     D.P.

C.A. No.      22CA011857

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE Nos.    18 JC 56078
                  18 JC 56079
                  18 JC 56080
                  18 JC 56081

DECISION AND JOURNAL ENTRY

Dated: October 31, 2022

TEODOSIO, Presiding Judge.

{¶1} Appellant, A.M., a.k.a. A.P., ("Mother"), appeals from a judgment of the Lorain County Court of Common Pleas, Juvenile Division, that placed three of her minor children in the legal custody of a maternal cousin ("Cousin") and her oldest child in the legal custody of that child's father, T.J. ("Father"). This Court affirms.

I.

{¶2} Mother is the biological mother of A.J., born December 2, 2004; V.B., born September 10, 2010; J.B., born January 28, 2014; and D.P., born May 27, 2017. Father is the biological parent of only the oldest child, A.J. The fathers of the other children are not directly involved in this appeal.

{¶3} On December 18, 2018, Lorain County Children Services ("LCCS") filed complaints, alleging that the children were neglected and dependent because of Mother's serious mental health and substance abuse problems, the deplorable condition of the home, and her failure to appropriately supervise the children. The children were later adjudicated neglected and dependent and placed in the temporary custody of Cousin under an order of protective supervision by LCCS.

{¶4} The trial court also adopted the case plan, which focused primarily on Mother addressing her mental health and substance abuse problems. The agency's primary substance abuse concerns were Mother's use of cocaine, methamphetamine, and alcohol. Shortly after this case began, Mother was the victim of a serious incident of domestic violence and kidnapping. Because Mother also had a history of domestic violence in her relationships with men, a domestic violence component was added to the case plan.

{¶5} During the next two years, Mother made some progress in mental health counseling, but she did not demonstrate that she could maintain sobriety for a sustained period. She completed a drug treatment program but was required to repeat the program after she tested positive for cocaine on January 28, 2020. According to one of her counselors, Mother had exhibited a pattern of relapsing to cocaine use each time she transitioned between levels of drug treatment. Mother again tested positive for cocaine in May 2020, when she was scheduled to transition from day treatment to intensive outpatient treatment. Mother refused to admit to her counselor that she had used cocaine but attempted to justify the positive screen by claiming that she had gotten cocaine residue on her skin. Her counselor told her that she did not believe that explanation because the positive screen could not have been the result of cocaine being absorbed through her skin. Consequently, Mother's daily drug treatment was extended for another 30 days

before she was able to step down to intensive outpatient treatment. Mother relapsed several more times during this case.

{¶6} LCCS eventually moved for the children to be placed in the legal custody of Cousin, where they had been living for nearly two years. Father moved for legal custody of his child, A.J. When this case began, Father did not have a close relationship with A.J., but he had developed a close relationship with her during this case. LCCS did not join in Father's motion, but the agency did not oppose him receiving legal custody of A.J. Mother alternatively sought the return of legal custody of her four children.

{¶7} Following an evidentiary hearing before a magistrate, A.J. was placed in the legal custody of Father and the youngest children were placed in the legal custody of Cousin. Mother filed objections to the magistrate's decision, which were overruled by the trial court. The trial court placed A.J. in the legal custody of Father and placed V.B., J.B., and D.P. in the legal custody of Cousin. Mother appeals and raises one assignment of error.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT'S DECISION TO [ADOPT] THE MAGISTRATE'S DECISION GRANTING LEGAL CUSTODY TO MATERNAL COUSIN AND LEGAL CUSTODY TO [FATHER] WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, CONTRARY TO LAW AND/OR AN ABUSE OF DISCRETION AND WAS NOT IN THE MINOR CHILDREN'S BEST INTEREST.

{¶8} Mother's sole assignment of error is that the trial court's legal custody decision was against the manifest weight of the evidence. An award of legal custody must be supported by a preponderance of the evidence. *In re M.F.*, 9th Dist. Lorain No. 15CA010823, 2016-Ohio-2685, ¶ 7. "Preponderance of the evidence entails the greater weight of the evidence, evidence that is

more probable, persuasive, and possesses greater probative value." (Internal quotations omitted.) *Id.*

{¶9} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal citations and quotations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶10} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H*., 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12. Mother argues that the children should have been returned to her custody because she had complied with the reunification requirements of the case plan. To begin with, case plan compliance may be relevant to the best interest of the children, but it is not determinative. *In re C.B.*, 9th Dist. Summit No. 30150, 2022-Ohio-1929, ¶ 21.

{¶11} Moreover, the record fails to support Mother's argument that she had made sufficient case plan progress. She relapsed numerous times during this case and had tested positive for cocaine as recently as 5 months before the hearing. After that positive screen in August 2020, Mother stopped submitting to drug screens for nearly two months because the caseworker was unable to meet up with her. Her drug counselor at that time was not aware that Mother had not been submitting to regular drug screening by LCCS.

**{¶12}** Although Mother challenged the chain of custody of some of the positive drug test evidence, she challenged only the most recent drug screens, which had been taken by the caseworker after the final hearing was already in progress. Even if those drug screens are disregarded, there was sufficient other evidence that Mother had relapsed repeatedly during this case, yet she continued to deny that she had been using. The caseworker, guardian ad litem, and one of Mother's former drug counselors all expressed concern that Mother was not honest with them about her drug use and had failed to demonstrate an extended period of sobriety. The weight of all the evidence presented at the hearing does not support Mother's assertion that she had made "significant case plan progress."

**{¶13}** No specific test or set of criteria is set forth by statute regarding an award of legal custody, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18, quoting *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23. The juvenile court is guided by the best interest factors enumerated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17. Those factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, and the child's need for permanence. R.C. 2151.414(D)(1)(a)-(e)[1]; *see also In re B.C.*, 9th Dist. Summit Nos. 26976 and 26977, 2014-Ohio-2748, ¶ 16.

**{¶14}** The juvenile court may also consider the best interest factors in R.C. 3109.04(F)(1). *In re K.A.*, 9th Dist. Lorain Nos. 15CA010850 and 15CA010860, 2017-Ohio-1, ¶ 17. While many

---

[1] R.C. 2151.414(D)(1)(e) also requires the trial court to consider whether any of the factors set forth in R.C. 2151.414(E)(7)-(11) apply to this case, but none of those factors are relevant here.

factors overlap with those set forth in R.C. 2151.414(D)(1), a separate factor relevant here is the proposed custodian's likelihood to honor and facilitate visitation or parenting time. R.C. 3109.04(F)(1)(f).

{¶15} Aside from asserting that she had complied with the case plan, Mother's brief on appeal raises only arguments about why Father and Cousin might not be ideal caregivers for the children. The final dispositional hearing was not a competition between the proposed custodians, however, as this was not a custody dispute between presumptively fit parents in domestic relations court. *See In re M.P.*, 9th Dist. Summit No. 25222, 2010-Ohio-3701, ¶ 8. These children had been removed from Mother's custody and adjudicated neglected and dependent because Mother was not providing them with a suitable home. *See In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, paragraph two of the syllabus (An adjudication of abuse, neglect, or dependency involves an implicit determination of the parent's unsuitability.). The primary focus at the final dispositional hearing was whether it was in the best interest of the children to be permanently placed in the legal custody of *any* of the potential custodians. *In re K.C.*, 9th Dist. Summit Nos. 26992 and 26993, 2014-Ohio-372, ¶ 20.

{¶16} As a party seeking legal custody of the children, Mother had her own burden of proving by a preponderance of the evidence that placement of the children in her legal custody was in their best interest. *In re A.W.*, 9th Dist. Lorain No. 20CA011671, 2021-Ohio-2975, ¶ 17, citing *In re T.R.*, 9th Dist. Summit Nos. 25179 and 25213, 2010-Ohio-2431, ¶ 27. Aside from testimony of her brother and two recent drug counselors, Mother offered no evidence to support her motion for legal custody. Notably, she did not testify on her own behalf, nor did she offer evidence about the best interest factors that the trial court was required to consider. This Court

will review the evidence that was before the trial court pertaining to the specific best interest factors.

### Interaction and interrelationships

**{¶17}** Mother's interaction with her children throughout most of this case was limited to supervised visitation because of concerns about her using drugs and exposing her children to violent men. Mother was permitted to have unsupervised visits in her home for a short period until Mother again tested positive for cocaine and LCCS learned that she had men in the home during visits who had not been approved by the agency.

**{¶18}** Cousin initially allowed Mother to visit at her home but, after the COVID pandemic began, Mother's visits were changed to virtual visits. Mother argues on appeal that she was "denied" in-person visits with her children, but the undisputed testimony of the caseworker and the guardian ad litem was that it was Mother who insisted that the visits be virtual. The caseworker and one of Mother's counselors testified that Mother has an unidentified health condition that makes her more susceptible to COVID and she was afraid of being exposed to the virus.

**{¶19}** The caseworker expressed concern that Mother insisted on virtual visits with her children because of the pandemic, yet she continued to go out in public to shop and socialize and she traveled to three different states during the first year of the pandemic. The caseworker repeatedly attempted to persuade Mother to resume in-person visits with her children, but Mother responded, "No, I'm just going to go virtual until court[.]" Moreover, Mother did not consistently attend scheduled visits. Mother was supposed to work with a parenting instructor during visits, but the instructor testified that he had not met with Mother many times because she did not always participate in scheduled visits.

{¶20} There was little evidence presented about Mother's relationship with the three youngest children, except that the children love Mother but are aware of her behavioral changes when she uses drugs and alcohol. Evidence was presented about her relationship with then sixteen-year-old A.J., which had become more strained during this case. Mother had behaved inappropriately numerous times by calling A.J. a traitor and telling her that she was not her daughter anymore because she had lived with Cousin and wanted to live with Father. A.J. was also hurt when Mother told her that one of the other children was her favorite child.

{¶21} A.J. suffers from depression and had expressed suicidal thoughts in the past. Shortly after this case began, Cousin arranged for A.J. to see a mental health counselor. A.J. made significant progress during this case with her counselor, whom she was seeing three times a week when the hearing began. Cousin and Father were supportive of A.J.'s counseling, but Mother had never reached out to the counselor to ask about A.J.'s progress.

{¶22} Father had developed a close relationship with A.J. during this case. He began with telephone calls, progressed to supervised and then unsupervised visits. When the hearing began, Father was visiting with A.J. in his home on Wednesdays and weekends. A.J. enjoyed their time together and had the opportunity to bond with her two half-siblings who lived in Father's home. By the end of the hearing months later, A.J. was living in Father's home and was doing well there. Father had stable employment and housing and had demonstrated his ability to provide A.J. with a suitable home. Father and Cousin were also working together to ensure that A.J. visited and maintained a relationship with V.B., J.B., and D.P.

{¶23} To support her argument that A.J. should not be placed with Father, Mother points to evidence that Father admittedly uses marijuana  The caseworker, A.J.'s counselor, and Cousin all testified that Father had a good relationship with A.J. and they had no concerns about his ability

to provide her with a safe and stable home, however. None of those witnesses had ever observed Father under the influence and testified that they did not believe that his marijuana use affected his ability to provide A.J. with a stable home. Father testified that he never used marijuana around A.J. and she had no access to it in his home.

{¶24} The evidence about the interaction and relationship between Cousin and the three youngest children was also positive. The children had been living in Cousin's home for more than two years and had adjusted well to living there. They were closely bonded to Cousin, who was meeting all their needs. A.J. wanted her siblings to remain in Cousin's home because they were safe there and she was afraid for their safety if they returned to Mother's home.

### Wishes of the Children

{¶25} A.J. expressed her wishes that she wanted to live on her own, but if that was not possible, she would prefer to live with Father. A.J.'s counselor had no concerns about Father's ability to provide A.J. with an appropriate home and she believed that he would continue her in counseling. A.J. told her counselor that she "doesn't want anything to do with her mom[.]" A.J. was angry with Mother and believed that she still had a substance abuse problem. The counselor testified that Mother would need to work to rebuild her relationship with A.J., but Mother had not reached out to the counselor. The guardian ad litem agreed that Father had demonstrated the ability to meet A.J.'s needs and that it was in her best interest to be placed in his legal custody. She believed that Father was meeting A.J.'s needs and she was impressed with how calm and thoughtful Father was with A.J.

{¶26} The guardian ad litem testified that V.B. and J.B. had told her that they wanted to go home, and she explained that D.P. was too young to decide where to live. The guardian ad litem did not believe that it was in the best interest of any of the children to return to the custody

of Mother, however. She explained that, although Mother loves her children, she had not demonstrated the ability to provide them with a safe and stable home. The guardian ad litem did not believe that Mother had resolved her drug problems or her history of exposing her children to violent men. She opined that legal custody to Cousin was in the best interest of V.B., J.B., and D.P. because Cousin had been providing them with a suitable home for over two years and had expressed a willingness and desire to provide them with a stable home until they reach adulthood.

### Custodial history and need for secure placement

{¶27} The children had been living in temporary placements for more than two years and needed a legally secure permanent placement. As detailed already, Mother had failed to demonstrate that she could provide her children with a safe and stable home at that time. Both Father and Cousin were willing and able to take legal custody of the respective children and provide them with a legally secure permanent home.

### Likelihood to facilitate visitation

{¶28} Finally, the trial court had evidence before it that both Father and Cousin would be likely to facilitate visits between Mother and her children and visits between the children, as they had done during this case. Father testified that he communicates well with Mother and Cousin and would work to facilitate visitation.

{¶29} The evidence was not disputed that the relationship between Mother and Cousin had deteriorated during this case. The evidence supported Mother's assertion that their relationship is "strained," but the evidence did not support her further argument that Cousin demonstrated "an obvious unwillingness and animosity" toward Mother. Mother did not testify at the hearing, nor did she or anyone else present evidence that Cousin was impeding her ability to have a relationship with her children. The only evidence before the trial court was that Cousin and

the caseworker had attempted to facilitate visits between Mother and the children throughout this case and Cousin testified that she would continue to do so.

{¶30}  After reviewing all the evidence presented at the final dispositional hearing, this Court cannot conclude that the trial court lost its way in placing A.J. in the legal custody of Father and V.B., J.B., and D.P. in the legal custody of Cousin.  Mother's assignment of error is overruled.

## III.

{¶31}  Mother's assignment of error is overruled.  The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

HENSAL, J.
SUTTON, J.
CONCUR.

APPEARANCES:

LINDSAY K. NICKOLLS, Attorney at Law, for Appellant.

J.D. TOMLINSON, Prosecuting Attorney, and JENNIFER A. TOMECHKO, Assistant Prosecuting Attorney, for Appellee.

ELAIN CARLIN, Guardian ad Litem.