**[Cite as *In re F.D.*, 2021-Ohio-2913.]**

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: F.D.

C.A. No.    29909

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    DN 17 08 0603

DECISION AND JOURNAL ENTRY

Dated: August 25, 2021

CALLAHAN, Judge.

{¶1}    Appellant Mother appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that granted legal custody of her child F.D. to the child's paternal cousin ("Cousin"). This Court affirms.

I.

{¶2}    Mother is the biological mother of F.D. (d.o.b. 2/1/13), as well as an older daughter and two younger sons. The three siblings and their two fathers are not parties to this appeal, but circumstances regarding them are relevant here. F.D.'s paternity was established. Father was incarcerated the entire time that the case pended in the juvenile court, although he maintained regular contact with the Summit County Children Services Board's ("CSB" or "the agency") caseworkers.

{¶3}    Mother has a long history of involvement with CSB since before F.D. was born. The agency filed its first complaint regarding F.D. upon his birth. The child was adjudicated

dependent at that time but remained in Mother's legal custody under the protective supervision of CSB. Shortly after protective supervision was terminated, while she was pregnant with her third child, Mother contacted the agency due to various issues that were impeding her ability to provide a safe and stable home for her children. Mother agreed to engage in services under a voluntary case plan in May 2014. CSB closed that case six months later, however, as Mother ultimately refused to participate in services. About a year later, after Mother had given birth to her fourth child, CSB removed all four children and filed complaints alleging that each was a neglected and dependent child. The four children were adjudicated neglected and dependent, and remained in Mother's legal custody under an order of protective supervision. Although Mother had not complied with all case plan objectives and was using marijuana, protective supervision was terminated and the case was closed in November 2016, once Mother had obtained stable housing.

{¶4} In May 2017, CSB removed the four children from Mother's home and filed new complaints regarding each. Due to timing issues, those complaints were dismissed and refiled in August 2017.[1] The agency alleged that F.D. was a dependent child based on (1) Mother's refusal to believe that her husband (the father of her two youngest children) had sexually abused her daughter; (2) the child's exposure to violence stemming from Mother's ongoing involvement in volatile romantic relationships; (3) Mother's untreated mental health issues which impacted her parenting abilities, and which Mother minimized; (4) Mother's aggression; (5) Mother's history of substance abuse; (6) Mother's history of refusing to engage in services; and (7) the expectation that Mother would be sentenced to incarceration at an upcoming criminal sentencing hearing. F.D. was adjudicated dependent and placed in the temporary custody of CSB.

---

[1] The four siblings' cases were consolidated for many of the proceedings below.

{¶5} The juvenile court adopted the agency's case plan as an order of the court. Father was ordered to contact the caseworker to express his interest in visitation or custody and to cooperate with CSB if the agency had concerns regarding his parenting ability. Mother was required to obtain mental health, parenting, and chemical dependency assessments and follow all recommendations. Over two and a half years into the case, the agency amended the case plan to require that Mother merely obtain a diagnostic assessment, follow all recommendations, and demonstrate appropriate interaction with adults and children.

{¶6} F.D. remained in CSB's temporary custody throughout this lengthy case. After several short placements with relatives and a foster home, the child was placed with a maternal aunt ("Aunt"), where he remained for almost two years. Mother sought legal custody of the child, while CSB moved for legal custody to Aunt. The agency later withdrew that motion because Aunt rescinded her interest in custody of F.D. The child was placed in a therapeutic foster home while CSB investigated the propriety of a maternal cousin for custody. Although the agency later filed a motion for legal custody to that cousin, it withdrew that motion and moved for permanent custody more than two years into the case.

{¶7} Pending the hearing on the motion for permanent custody, CSB continued to investigate family members, including Cousin, for potential placement and custody. After assessing and approving Cousin for placement, the agency facilitated visits. F.D. responded well to the structure in Cousin's home. With Cousin's cooperation, he was also able to visit with his three siblings who had been placed in the legal custody of other relatives. CSB withdrew its motion for permanent custody, moved for legal custody to Cousin, and placed F.D. in Cousin's home.

{¶8} Mother moved for legal custody. Because the child's wishes conflicted with the recommendation of the guardian ad litem, an attorney was appointed for F.D. The child moved for legal custody to Mother. Father supported the agency's motion for legal custody to Cousin. The guardian ad litem initially expressed some reservations regarding Cousin in her report filed two months before the hearing. After additional investigation, the guardian ad litem revised her report and fully supported an award of legal custody to Cousin.

{¶9} A magistrate conducted a hearing on the various dispositional motions and issued a decision ordering legal custody to Cousin. Mother filed timely objections and CSB responded in opposition. The juvenile court overruled Mother's objections and granted legal custody of F.D. to Cousin. Mother filed a timely appeal and raises one assignment of error for review.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT DID NOT GRANT MOTHER LEGAL CUSTODY AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶10} Mother argues that the juvenile court's judgment granting legal custody of F.D. to Cousin was against the manifest weight of the evidence. This Court disagrees.

> On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence. Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest.

(Internal citations and quotations omitted.) *In re M.F.*, 9th Dist. Lorain No. 15CA010823, 2016-Ohio-2685, ¶ 7.

{¶11} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers

the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal citations and quotations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶12} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12. The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18, quoting *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23. In that regard, the juvenile court is guided by the best interest factors enumerated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17. Those factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); see also *In re B.C.*, 9th Dist. Summit Nos. 26976 and 26977, 2014-Ohio-2748, ¶ 16. In addition, the juvenile court may also look to the best interest factors in R.C. 3109.04(F)(1) for guidance. *In re K.A.*, 9th Dist. Lorain Nos. 15CA010850 and 15CA010860, 2017-Ohio-1, ¶ 17. While some factors overlap with those above, others include the child's adjustment to his or her environment; the mental and physical

health of all persons involved; the parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio. R.C. 3109.04(F)(1).

{¶13} F.D. was just over four years old when he was removed from Mother's custody, and almost eight years old when the juvenile court awarded legal custody of the child to Cousin. During that time, he remained in the temporary custody of CSB and was placed with six different caregivers. Several of the child's placements disrupted due to his behavioral issues. F.D. has been diagnosed with disruptive mood dysregulation and attention deficit hyperactivity disorder. From the time of his removal, the child has exhibited issues with anger, verbal and physical aggression to peers and adults, destruction of property, oppositional defiant behaviors, lack of social skills and boundaries, difficulty accepting responsibility for his actions, and inappropriate sexual comments and behaviors.

{¶14} The Akron Public School system referred F.D. to Bridges Learning Center ("Bridges"), part of Red Oak Behavioral Health ("Red Oak"), to address his behavioral issues. Bridges is a restrictive school environment which provides additional services to help children who are struggling with behavioral issues. All students have individualized education plans ("IEP"). Each classroom has a teacher and a teacher's aide. The maximum adult to student ratio is 1 to 5 in each classroom. In addition, students work with in-school therapists who provide psychotherapy and support. Children also have access to an on-site psychiatrist for medication management, if necessary. The academic curriculum mirrors that of the public school. The goal of the Bridges program is to facilitate a child's eventual return to a traditional and less restrictive classroom setting.

{¶15} F.D. receives services from two therapists and a psychiatrist at Bridges. One of the therapists testified regarding the child's participation and progress. F.D. is on three medications to address his impulsivity and lack of focus. In the past six to eight months since he had been placed with Cousin, the child's behaviors have significantly improved. The therapist has made several visits to Cousin's home and witnessed the structure and accountability therein. Since that placement, F.D.'s aggression has lessened, his bouts of anger de-escalate more quickly as he has learned to self-regulate better, and he has ceased efforts to sabotage his situation as he has come to experience positive rewards for good behavior.

{¶16} The Bridges therapist has had the opportunity to see Mother and the child interact. Mother has always been appropriate and attentive, and F.D. is always happy to see Mother. The child's inappropriate behaviors tend to escalate after visits with Mother, and F.D. has expressed concerns that Mother would no longer consider him part of her family if he was placed in the legal custody of a third party.

{¶17} Mother was enrolled in her own mental health services at Red Oak but she was discharged for failing to attend. Had Mother participated, Red Oak could have incorporated Mother in F.D.'s counseling sessions at Bridges. Mother indicated her displeasure with the child's presence at Bridges, telling the child and the CSB caseworker that Bridges was for bad children. Mother was clear that, if she regained legal custody, she would remove F.D. from Bridges and terminate his use of medications. The therapist testified that removing the child from Bridges would forfeit his IEP and preclude his participation in necessary therapeutic services.

{¶18} Cousin is cooperative with the professionals at Bridges. She planned to maintain F.D. there until it was determined that he could successfully assimilate into a conventional

classroom setting. Cousin supported maintaining the child on his prescribed medications which helped regulate his behaviors. The child's therapist emphasized the need for ongoing therapy, medication management, and structure so that F.D. could continue to make progress and diminish his inappropriate behaviors. The therapist was concerned that if the child was returned to Mother's legal custody, Mother would not follow through with the necessary services for the child, especially given Mother's failure to follow through on her own therapy. The therapist emphasized, however, that if F.D. was placed in the legal custody of Cousin, it was important for the child to maintain regular contact with Mother based on their bond.

{¶19} F.D. has acclimated well into Cousin's home. He shares a bedroom with Cousin's teenaged son. A 19-year-old daughter also lives in the home. The child has a very close relationship with Cousin and her daughter, both of whom provide structure and do not react to his attempts to manipulate them. F.D.'s attempts at manipulation have subsided in Cousin's home.

{¶20} Cousin allows contact between the child and both his parents. She recognizes the importance of allowing F.D. to have a relationship with Mother and Father and she testified that she would continue to facilitate that. In fact, Cousin rejected the idea of adopting the child and receiving an adoption subsidy, preferring legal custody so that F.D. would maintain a legal relationship with both parents. Father calls and emails from prison multiple times each week. F.D. is excited to be able to develop a relationship with his father. Upon Father's eventual release from prison, Cousin asserted that she would monitor visitations to determine the level of supervision necessary to ensure the child's safety. Cousin maintains contact with Mother to set up visits based on Mother's schedule. Mother has failed to appear for many visits, including Skype calls. F.D. worries that he will not see Mother again when she fails to visit with him.

Cousin reassures the child and encourages Mother to reschedule and maintain consistent visitation with F.D.

**{¶21}** The child has expressed his desire to live with Mother. The guardian ad litem opined that it is in the child's best interest to be placed in the legal custody of Cousin, where his needs are being met.

**{¶22}** F.D.'s custody has been in limbo for more than three years, during which he has lived in six different placements. The child requires a permanent home. Mother has not demonstrated that she can provide him with a safe and stable home environment at any time during this case. On the other hand, Cousin has demonstrated the commitment to providing F.D. with stability, structure, and care necessary to meet his basic and special needs.

**{¶23}** Mother has struggled with long term mental health issues, including bipolar disorder, intermittent explosive disorder, borderline personality disorder, and general anxiety. She has engaged with multiple mental health providers but only on an inconsistent basis. Mother has told the agency caseworker that she will stick with therapy when she finds a counselor who tells her what she wants to hear. She eschews the use of prescribed psychiatric medications for both herself and her child.

**{¶24}** Mother has participated in various parenting education programs. She did not get a certificate for a program in 2018, because she started attending the classes two months after they began. She began attending a group for mothers called The Connect but was asked to leave and not return after a few weeks after she became aggressive towards a younger mother in the group. She received a certificate for participating in The Moms Program at a public library, but CSB was unable to obtain information regarding the curriculum or accreditation for that program. Mother successfully completed The Parent Project at Red Oak in April 2019.

Nevertheless, the agency caseworker testified that Mother was never able to demonstrate an understanding or application of the skills taught.

{¶25} Mother has not demonstrated that she will provide a safe and stable home for F.D. Mother's own mental health is not stable, and she has asserted that she will not maintain the necessary mental health services for the child. She has not explained how she would provide structure for F.D. outside of using corporal punishment and intimidation to manage his behavior.

{¶26} Cousin has demonstrated the desire and ability to provide the appropriate home environment for F.D. that Mother cannot. The child's behavior has greatly improved since living in Cousin's home. He is comfortable and secure in a home with a caregiver who is responsive to his basic and special needs. Cousin provides the child with consistent and frequent contact with his parents.

{¶27} Based on a thorough review of the record, this is not the exceptional case in which the trier of fact clearly lost its way and committed a manifest miscarriage of justice by granting CSB's motion for legal custody of F.D. to Cousin. The preponderance of the evidence established that Mother had not adequately addressed her mental health issues to allow her to provide a safe and stable home environment for F.D. Mother remains volatile. She has consistently rejected services designed to help her manage her inappropriate behaviors.

{¶28} F.D. has also struggled with long term behavioral issues. The child requires consistency, structure, counseling, and medication management to thrive. Mother is opposed to maintaining F.D. at Bridges where his behavior has improved under the guidance and support of staff. Mother has also asserted that she does not want F.D. to take medications although they help the child regulate both his emotions and behaviors and allow him to engage effectively in classroom learning.

{¶29} On the other hand, Cousin fully supports F.D.'s participation in services designed to assist the child. Cousin plans to maintain F.D. at Bridges until the professionals recommend his return to a conventional classroom setting. Cousin supports the psychiatrist's advice to maintain the child on medication to help manage his behaviors. Cousin provides structure for the child in her home, and F.D.'s violent and other inappropriate behaviors have de-escalated under her care.

{¶30} Although the child wishes to return to Mother, the guardian ad litem recommended that legal custody to Cousin would be in F.D.'s best interest. Cousin has demonstrated her willingness to maintain regular and safe contact between the child, both his parents, and his three siblings. Under these circumstances, the juvenile court's finding that an award of legal custody to Cousin was in the child's best interest is not against the manifest weight of the evidence. Mother's assignment of error is overruled.

III.

{¶31} Mother's sole assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

 

 

LYNNE S. CALLAHAN
FOR THE COURT

HENSAL, P. J.
SUTTON, J.
CONCUR.

APPEARANCES:

DENISE E. FERGUSON, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.

ALEXANDRA HULL, Attorney at Law, for the child.

ALAN MEDVICK, Attorney at Law, for Appellee.

ANGELINA GINGO, Guardian ad litem.