[Cite as *In re F.D.*, 2023-Ohio-706.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: F.D.

C.A. No.     30410
                 30431

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 17 08 0603

DECISION AND JOURNAL ENTRY

Dated: March 8, 2023

CARR, Presiding Judge.

{¶1}    Appellants Mother and Father appeal the judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated their parental rights and placed their child in the permanent custody of Summit County Children Services Board ("CSB" or "the agency"). This Court affirms in part, reverses in part, and remands.

I.

{¶2}    Mother and Father are the biological parents of F.D., born February 1, 2013. Father was incarcerated shortly after the child's birth. F.D. resided with Mother, multiple half siblings, and at least one man with whom Mother had a relationship.

{¶3}    Before and after F.D.'s birth, CSB had frequent involvement with Mother. The agency filed complaints regarding the child and his siblings in 2013 and 2016.[1] F.D. was

---

[1] Mother also sought agency intervention on a voluntary basis in 2014. CSB closed that case six months later because Mother refused to participate in services.

adjudicated dependent in the 2013 case, and neglected and dependent in the 2016 case. Both of those cases terminated with the return of the child and his siblings to Mother's custody.

{¶4} In 2017, CSB again filed complaints regarding F.D. and his siblings. The allegations underlying the complaints included, among other things, concerns regarding sexual abuse of one of the children by Mother's then-husband, the children's exposure to domestic violence in the home, Mother's untreated mental health and substance abuse issues, and the possibility that Mother would be incarcerated after a recent criminal conviction. After hearings, F.D. was adjudicated dependent and placed in the temporary custody of CSB on November 13, 2017.

{¶5} The juvenile court adopted the agency's case plan as an order. While Mother's case plan objectives addressed mental health, substance abuse, and parenting issues, Father was required only to contact CSB to express any interest he might have in pursuing visitation and/or custody of the child.

{¶6} The case continued for over two and a half years, during which F.D. remained in the agency's temporary custody and was moved from placement to placement. After multiple family members withdrew their interest in providing a permanent home for the child, CSB filed a motion for permanent custody. When a paternal cousin ("Cousin") expressed an interest in placement in the interim, however, the agency assessed that home, placed the child there, withdrew its motion for permanent custody, and filed a motion for legal custody to Cousin. Mother filed a motion for legal custody, while Father supported the agency's motion.

{¶7} After a hearing, the juvenile court granted CSB's motion for legal custody to Cousin on December 23, 2020. Mother filed a timely notice of appeal with this Court. Unfortunately, within two months, and while Mother's appeal was pending, F.D.'s legal custody

disrupted when Cousin abandoned him at a hospital, refusing to maintain the child in her home. The police took the child into custody pursuant to Juv.R. 6. As visitation issues were ongoing in the 2017 juvenile case, on February 19, 2021, CSB filed a motion for emergency temporary custody and a motion to modify the child's disposition from legal custody (to Cousin) to temporary custody to the agency under that case number in lieu of filing a new complaint.

{¶8} The juvenile court granted an ex parte order of emergency temporary custody the same day. Five days later, after a shelter care hearing, the magistrate issued an order stating that F.D. "shall remain in the temporary custody of [CSB]." Shortly thereafter, the agency filed a notice of an emergency placement change for the child, explaining that he had been placed at Ohio Guidestone Residential Treatment Center ("Ohio Guidestone") because he was exhibiting aggressive and destructive behaviors in the therapeutic foster home where he had been placed after being removed from Cousin's custody.

{¶9} While Mother filed a motion for legal custody, she also moved to dismiss the case. She argued that the juvenile court lacked jurisdiction to consider CSB's motion to modify custody because the case had been closed when the court ordered that F.D. be placed in the legal custody of Cousin. CSB responded in opposition. The magistrate issued a decision after a "file review," denying Mother's motion to dismiss.

{¶10} CSB filed an amended case plan. Mother was required to intensify her engagement in mental health services and follow all recommendations, avoid relationships with violent people or those with anger management issues, and submit to a chemical dependency assessment and follow all recommendations. Father was required to contact the CSB caseworker to express his interest in visitation and/or custody. There were additional requirements for F.D.'s caregiver to ensure that the child receive mental health services. Mother objected to the case plan, arguing that

it was unconstitutional and statutorily defective because it was "not premised to assist Mother to remedy the problems that initially caused the child[ ] to be placed outside the home." After hearing evidence, the magistrate found that "Mother's situation remains precarious" and adopted the case plan as an order of the court. Mother moved to set aside that order.[2]

{¶11} During the next three and a half months, there was a flurry of docket activity. CSB filed motions for permanent custody, a judicial determination that the agency had used reasonable efforts, and for a reasonable efforts bypass determination. Mother filed a renewed motion to dismiss the case for lack of jurisdiction, an objection to a judicial determination of reasonable efforts, and a supplemental "objection" challenging the magistrate's adoption of the amended case plan. Father wrote a letter to the court reiterating his interest in pursuing legal custody and asserting that CSB had not prepared any case plan objectives to allow him to attempt to remedy any agency concerns about him. CSB filed briefs in opposition to Mother's motion to dismiss and her supplemental "objection" to the magistrate's order adopting the case plan. The child filed a motion for legal custody to Mother, or alternatively, temporary custody to Mother under the protective supervision of CSB; and a motion for visitation with Mother. CSB responded that Mother has the opportunity to visit with the child but she fails to take advantage of those opportunities.

{¶12} In one judgment entry, the juvenile court denied Mother's motions to dismiss and deny a reasonable efforts finding. In a second judgment entry on August 24, 2021, the trial court denied Mother's motion to set aside the magistrate's order and adopted CSB's case plan as an order. The court further ordered that F.D. would remain in the temporary custody of CSB. The

---

[2] Although she was challenging a magistrate's order, not a decision, Mother captioned her opposition as an objection.

next day, on August 25, 2021, this Court issued an opinion disposing of Mother's appeal and affirming the award of legal custody of the child to Cousin.[3] *In re F.D.*, 9th Dist. Summit No. 29909, 2021-Ohio-2913.

{¶13} On August 26, 2021, the magistrate held a review hearing and ordered that F.D. would remain in CSB's temporary custody. The juvenile court scheduled a final dispositional hearing for March 30-31, 2022. In the interim, Father filed a pro se "Statement for Trial" in which he (1) asserted that his appointed attorney had not responded to his letters in more than two years, (2) informed the court that he would be released from prison to a halfway house on March 24, 2022, (3) reiterated his desire to seek legal custody of the child, and (4) requested that CSB develop case plan objectives to allow him to pursue reunification with F.D. Two months later, Father's attorney filed a motion for legal custody to Father, with or without the protective supervision of CSB.

{¶14} The final dispositional hearing was held before a visiting judge who thereafter ordered the parties to file (1) briefs relating to whether the court was required to dismiss the case; (2) closing arguments, if desired; (3) proposed findings of facts and conclusions of law; and (4) proposed judgment entries. CSB, Mother, and the child filed proposed findings of fact and conclusions of law. The agency filed a brief in support of the juvenile court's jurisdiction over the case.

{¶15} More than four months after the permanent custody hearing, the child filed a motion for a review hearing, asserting that the evidence adduced at the dispositional hearing was "sufficiently stale that any decree will not address this child's changeable circumstances nor the

---

[3] No party informed this Court while Mother's appeal was pending that F.D.'s legal custody had disrupted and that he had been returned to CSB's custody.

status of his father." The child argued that the juvenile court should consider Father's stability acquired since the permanent custody hearing before issuing a judgment based on "gravely stale" facts so as to avoid an inequitable result. An hour later, the visiting judge filed a short "Judgment Entry" in which he (1) "dismissed" the various parties' motions to dismiss CSB's motion for permanent custody; (2) approved, adopted, attached, and incorporated therein CSB's proposed findings of fact and conclusions of law; and (3) asserted that he had "separately filed a final entry to conclude this case." The juvenile court's separate final entry consisted of an "Order" containing certain findings pursuant to R.C. 2151.414(B)(1)(a) and (d), (D)(1) and (2), (E)(2), and (F)(1)(b). The trial court denied Mother's and Father's separate motions for legal custody, granted CSB's motion for permanent custody, and terminated Mother's and Father's parental rights.

{¶16} Mother and Father each filed timely appeals. Mother raises three assignments of error, and Father raises two assignments of error. This Court rearranges and consolidates some assignments of error to facilitate review.

II.

**MOTHER'S ASSIGNMENT OF ERROR II**

THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED PLAIN AND REVERSIBLE ERROR WHEN IT DENIED MOTHER'S MOTION TO DISMISS.

**{¶17}** Mother argues that the juvenile court lacked jurisdiction to rule on CSB's motion for permanent custody because the agency failed to file a complaint alleging F.D.'s dependency, neglect, and/or abuse and the child was never adjudicated as such. This Court disagrees.

**{¶18}** In support, Mother cites only R.C. 2151.31(D) which requires a child welfare agency to file a complaint regarding a child alleged to be dependent, neglected, and/or abused if the agency has sought, and the juvenile court has granted, an emergency order of temporary custody. It is well settled that "[t]he authority of a juvenile court in abuse, dependency, and neglect cases * * * is strictly governed by the comprehensive statutory scheme set forth in R.C. Chapter 2151." *See, e.g., In re C.C.*, 9th Dist. Medina Nos. 17CA0008-M and 17CA0009-M, 2017-Ohio-8620, ¶ 12. Moreover, "[t]he dispositional authority of the juvenile court to place children who have been adjudicated abused, neglected, and/or dependent is governed by R.C. 2151.353." *Id.*

**{¶19}** R.C. 2151.353(A) sets forth six possible dispositional orders for children who have been adjudicated. Those include protective supervision, temporary custody, legal custody, planned permanent living arrangement, permanent custody, and removal of certain person(s) from the child's home. *Id.* Here, F.D. was adjudicated a dependent child in juvenile case number DN 17-08-0603, on November 13, 2017. Thereafter, he was ultimately placed in the legal custody of Cousin and the juvenile court closed the case while expressly maintaining "continuing jurisdiction over the Child pursuant to R.C. 2151.353."

**{¶20}** Mother's argument disregards the comprehensive statutory scheme of R.C. Chapter 2151. R.C. 2151.353(F)(1) states that "[t]he [juvenile] court shall retain jurisdiction over any child for whom the court issues an order of disposition pursuant to division (A) of this section * * * until the child attains the age of eighteen years * * *." In addition, subsection (F)(2) provides:

> Any public children services agency, * * * by filing a motion with the court, may at any time request the court to modify or terminate any order of disposition issued pursuant to division (A) of this section * * *. The court shall hold a hearing upon the motion as if the hearing were the original dispositional hearing and shall give all parties to the action and the guardian ad litem notice of the hearing pursuant to the Juvenile Rules. If applicable, the court shall comply with section 2151.42 of the Revised Code.

R.C. 2151.42 recognizes the propriety of modifications or terminations of prior final dispositional orders and sets out certain express factors the juvenile court must consider under those circumstances. There is no requirement under these provisions for the agency to file a new complaint or for the juvenile court to adjudicate the child anew.

**{¶21}** In this case, CSB properly invoked the juvenile court's continuing jurisdiction pursuant to R.C. 2151.353(F) when it moved to modify the prior legal custody order, and the court exercised same. For those reasons, the juvenile court did not err when it denied Mother's motion to dismiss for lack of jurisdiction. Mother's second assignment of error is overruled.

**{¶22}** This Court notes that the appellee-child echoed Mother's challenge to the juvenile court's jurisdiction in his appellate brief. To the extent that F.D. attempts to raise a cross-assignment of error, we decline to address it.

**{¶23}** R.C. 2505.22 provides, in pertinent part:

> In connection with an appeal of a final order, judgment, or decree of a court, assignments of error may be filed by an appellee who does not appeal, which assignments shall be passed upon by a reviewing court before the final order, judgment, or decree is reversed in whole or in part.

F.D. did not file a notice of appeal from the juvenile court's judgment awarding permanent custody. Assuming that the appellee-child intended to assign error to the trial court's denial of Mother's motion to dismiss, in the absence of a notice of appeal, that assignment of error "may only be 'used by the appellee as a shield to protect the judgment of the lower court but may not be used by the appellee as a sword to destroy or modify that judgment.'" *Colonial Life & Accident v. Leitch*, 9th Dist. Summit No. 24263, 2008-Ohio-6616, ¶ 18, quoting *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 112 Ohio St.3d 470, 2006-Ohio-6553, ¶ 32. Here, by his argument, F.D. seeks reversal of the judgment. Under those circumstances, to the extent that the child supports Mother's argument that the juvenile court lacked jurisdiction to consider CSB's motion for permanent custody, this Court cannot consider the child's purported assignment of error.

## MOTHER'S ASSIGNMENT OF ERROR III

> THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED PLAIN AND REVERSIBLE ERROR WHEN IT DENIED MOTHER'S REPEATED MOTIONS TO DISMISS HER COUNSEL.

{¶24} Mother argues that the juvenile court erred by denying her request to represent herself during the permanent custody hearing. This Court disagrees.

{¶25} The record contains no clear request or affirmative demand by Mother to represent herself at the permanent custody hearing. While she expressed displeasure at her attorney's performance, she did not expressly inform the juvenile court that she wanted to assume the duties of self-representation. Assuming arguendo that Mother's lack of confidence in her appointed counsel rose to the level of a request to proceed pro se, this Court concludes that the juvenile court did not err by denying that request.

{¶26} Despite proper notice of the proceedings, Mother had not yet appeared in the courtroom when the permanent custody hearing began 45 minutes after the scheduled time.

Mother did not appear until well into the testimony of the fourth witness. Up to that time, Mother's attorney was in court and actively representing Mother's interests, including cross-examining each of CSB's witnesses. Within minutes of Mother's arrival in court, she interrupted and told the judge that she wished to "let [her] lawyer go" because he "ha[d] not yet to do what [she] asked." Mother did not specifically ask to be able to represent herself. Given Mother's recent appearance in the courtroom, the judge informed Mother that they would address her concerns "in a little bit[,]" as Mother had arrived in the middle of a witness' testimony.

{¶27} After the agency's fifth witness testified, Mother left the courtroom, although she left her cell phone near where she had been sitting. Mother was not present for the testimony of CSB's next three witnesses. Her attorney, however, continued to cross-examine witnesses and object to certain evidence in her absence.

{¶28} When Mother returned to the courtroom, CSB called her as a witness as if on cross-examination. Mother was argumentative, asserted that she did not agree to testify, and invoked her right to "plead the Fifth." While she informed the court that she wanted to fire her attorney, she told her attorney, "You need to do your job, sir. I can't be my lawyer and answer [the assistant prosecutor's] questions at the same time." Accordingly, not only did Mother not expressly request to represent herself, but she directed her attorney to represent her and tacitly acknowledged that she was not competent to do so herself.

{¶29} After continuing to be uncooperative as a witness, Mother again left the courtroom. She did not return for the remainder of the hearing. Her attorney continued to represent Mother's interests by cross-examining witnesses, raising objections, renewing Mother's motion to dismiss the case, and inquiring about Mother's earlier request to represent herself. The juvenile court ordered that "to the extent that that was a request, it's overruled at this point." The court reasoned

that, given Mother's absence for most of the hearing at which the termination of her parental rights was at issue, the competent participation of her appointed counsel, and Mother's vague assertions, he was loath to release her attorney during the hearing.

{¶30} Under the circumstances, this Court concludes that the trial court did not abuse its discretion by denying any alleged request. Mother arrived 45 minutes late to the permanent custody hearing, made ambiguous statements regarding her legal representation, left the hearing again after the trial court judge indicated he would address her concerns shortly, came back and testified making more ambiguous statements regarding counsel and representation, and then left the courtroom again. Accordingly, Mother has not demonstrated prejudicial error. Mother's third assignment of error is overruled.

## MOTHER'S ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED WHEN IT GRANTED PERMANENT CUSTODY TO [CSB] AND DENIED MOTHER'S MOTION FOR LEGAL CUSTODY AS THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.

## FATHER'S ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FINDING THAT THE CHILD COULD NOT OR SHOULD NOT BE RETURNED TO FATHER PURSUANT TO [R.C.] 2151.414(E).

## FATHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT'S GRANTING OF [CSB'S] MOTION FOR PERMANENT CUSTODY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]

{¶31} Mother and Father argue that the juvenile court's judgment awarding permanent custody of F.D. to CSB is against the manifest weight of the evidence.

{¶32} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the

credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶33} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). The best interest factors include: the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 9th Dist. Summit Nos. 24834 and 24850, 2009-Ohio-6284, ¶ 11. Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶34} In its motion for permanent custody, CSB asserted multiple first-prong grounds. Pursuant to R.C. 2151.414(B)(1)(a), it alleged that the child could not or should not be returned to the parents' care based on several subsection (E) factors. As to Mother only, the agency alleged that she had failed to remedy the concerns that necessitated the agency taking the child into care pursuant to subsection (E)(1), and that Mother was unwilling to provide for the child's basic needs pursuant to subsection (E)(14). As to Father, CSB alleged that he was incarcerated and unable to care for the child for at least the next 18 months pursuant to subsection (E)(12). Finally, the agency cited the catchall "any other [relevant] factor" provision pursuant to subsection (E)(16), noting the child's multiple mental health diagnoses, aggression, and behavioral issues.

{¶35} As alternative first-prong grounds, CSB alleged that F.D. had been in the agency's temporary custody for 12 or more months of a consecutive 22-month period pursuant to R.C. 2151.414(B)(1)(d); and that F.D. and/or one of his siblings had been adjudicated dependent, neglected, or abused on three separate occasions pursuant to subsection (B)(1)(e). In addition, the agency's second-prong allegations cited the various R.C. 2151.414(D) factors to argue that an award of permanent custody was in the child's best interest.

**First-prong finding**

{¶36} Father's first assignment of error challenges only the juvenile court's first-prong finding that the child could not or should not be returned to Father's custody based on R.C. 2151.414(E)(12), the only allegation as to him. Mother appears to argue that the child was not in the agency's temporary custody for at least 12 months of the preceding 22-month period.

{¶37} Father is correct that the juvenile court did not make any first-prong finding explicitly relating to Father in the agency's motion for permanent custody. The juvenile court found that F.D. could not or should not be returned to Father based on Father's failure to remedy

the concerns underlying the child's removal pursuant to R.C. 2151.414(B)(1)(a)/(E)(1).[4]  As CSB did not allege subsection (E)(1) in its permanent custody motion as to Father, the juvenile court's finding in that regard was irrelevant and did not substantiate an alleged first-prong ground.  That does not end the inquiry, however.

{¶38}  CSB alleged two other alternative first-prong grounds that inherently applied to both parents, to wit, "12 of 22" pursuant to R.C. 2151.414(B)(1)(d), and three or more adjudications pursuant to subsection (B)(1)(e).  Although the agency might allege alternative first-prong grounds in support of its motion for permanent custody, it need only prove one.  *In re T.B.*, 9th Dist. Summit Nos. 29560 and 29564, 2020-Ohio-4040, ¶ 11.

{¶39}  Here, the agency presented no evidence at the hearing that F.D. or any of his siblings had been adjudicated dependent, neglected, or abused pursuant to R.C. 2151.414(B)(1)(e), and the juvenile court made no such finding.  However, the juvenile court made the express alternative finding that the child had been in CSB's temporary custody for at least 12 months of a consecutive 22-month period immediately prior to the time the agency filed its motion for permanent custody.  The record supports this finding.

{¶40}  CSB filed its motion for permanent custody on May 10, 2021.  Therefore, the 22-month lookback period began on July 10, 2019.  There was no formal dispositional hearing as required by R.C. 2151.353(F)(2)[5] after CSB reassumed the child's custody after his legal custody

---

[4] The juvenile court's order cited subsection (E)(2) but recited the verbiage consistent with a finding pursuant to (E)(1).  CSB's proposed findings of fact and conclusions of law, which the juvenile court adopted, did not specifically cite any subsection (E) factor in support of its proposed finding that the child could not or should not be returned to either parent.

[5] After the agency files a motion to modify a prior dispositional order, "[t]he court shall hold a hearing upon the motion as if the hearing were the original dispositional hearing and shall give all parties to the action and the guardian ad litem notice of the hearing pursuant to the Juvenile Rules."

situation disrupted. The child was placed in the agency's emergency temporary custody on February 19, 2021. At the shelter care hearing a few days later, the magistrate issued an order that F.D. "shall remain in the temporary custody of [CSB]," but a shelter care hearing is not a dispositional hearing and there was no formal order placing the child into CSB's temporary custody. Even disregarding any time after the child was placed in Cousin's legal custody, however, F.D. was in the agency's temporary custody well in excess of 12 months during the consecutive 22-month period prior to the agency's filing of its permanent custody motion.

{¶41} From July 10, 2019, the first day of the relevant lookback period, until December 23, 2020, when F.D. was placed in the legal custody of Cousin, the child was in CSB's temporary custody. That amounted to a period in excess of 17 months. Accordingly, the juvenile court's first-prong finding that F.D. has been in the agency's temporary custody for 12 or more months of a consecutive 22-month period is supported by clear and convincing evidence and not against the manifest weight of the evidence. Father's first assignment of error is overruled.

**Best interest of the child**

{¶42} Mother and Father both argue that the juvenile court's finding that an award of permanent custody was in the child's best interest is against the manifest weight of the evidence.

Custodial history of the child

{¶43} At best, F.D. spent very little time in Father's custody, as Father went to prison shortly after the child's birth. F.D. was removed from Mother's custody in this case when he was four and a half years old.[6] Since that time, he lived in multiple foster homes and relative placements until he was placed in the legal custody of Cousin when he was almost 8 years old.

---

[6] The agency caseworker did not testify regarding prior cases during which CSB might have removed F.D. from Mother's home for various periods of time.

That disposition disrupted two months later. CSB resumed the child's custody at that time and placed him briefly in a therapeutic foster home and then at a residential treatment facility, where he remained for the duration of the case.

Interaction and Interrelationships of the child

{¶44} The caseworker and guardian ad litem described F.D. as a very intelligent child, but one who has significant mental health and behavioral issues. He has been diagnosed with disruptive mood dysregulation disorder, attention-deficit/hyperactivity disorder which presents predominantly as hyperactive impulse control issues, and conduct disorder. F.D. exhibits verbal and physical aggression, especially when he becomes frustrated. The child struggles to accept responsibility for his actions, and his aggression escalates when he does not get what he wants. In addition, he exhibits some sexualized behaviors and language which are not age-appropriate. However, his prior in-school therapist testified that the child never sexually assaulted anyone at their facility.

{¶45} F.D. struggles in relationships with both peers and adults. Many care providers requested the child's removal from their homes based on his aggressive and destructive behaviors. Legal custody to Cousin and placement in his most recent therapeutic foster home disrupted after the child threatened serious physical harm to the family members living in those homes.

{¶46} F.D. loves Mother but has expressed anger toward her because she has missed many visits and not remained in recent contact with the child. On the other hand, F.D. has developed an emotionally close relationship with Father who maintained frequent and consistent contact with the child since this case began in 2017. Although he was in prison during that time, Father wrote multiple letters each week to the child and called him on a regular basis. Father has worked hard to mentor the child, offering him advice to help F.D. cope with frustration and manage aggressive

impulses. As Father was released from prison a week before the hearing, he and the child were able to have their first video visit.

{¶47} The child's current mental health worker at Ohio Guidestone testified that F.D. responds well to Father's phone calls and never exhibits escalating behaviors after contact with Father. The Ohio Guidestone worker added that F.D. always has something positive to say about Father and that she recognizes that Father and the child share an emotional bond. The child's psychotherapist at Ohio Guidestone testified that F.D. is "pretty upbeat" about contact with Father. The CSB caseworker described Father as the "most consistent adult voice in [F.D.'s] life over the pendency of this case[.]"

The wishes of the child

{¶48} F.D. was nine years old at the time of the permanent custody hearing. Earlier in the case, he expressed the desire to return to Mother's custody. However, certain comments by Mother, coupled with Mother's sporadic contact with the child, aroused a sense of anger in F.D. toward her. The child's Ohio Guidestone mental health worker testified that the child says that "he wants to go with his dad."

{¶49} The guardian ad litem opined that an award of permanent custody would be in the child's best interest. While she "admire[s]" Father for the plans he has implemented to establish his life outside of prison, his consistent contact with the child, and his ongoing commitment to seek custody of the child, the guardian ad litem expressed concerns about Father's criminal history and whether he would be able to provide stability for a child with significant behavioral issues. The guardian ad litem acknowledged, however, that CSB had not investigated any placement options for the child in anticipation of his discharge from Ohio Guidestone. Accordingly, the

agency had not identified any plans for providing ongoing stability for the child at the time of the hearing.

The child's need for permanence

{¶50} F.D. has experienced many custodial displacements throughout his nine years of life and he deserves permanence in an environment that offers security, stability, and consistency. CSB presented a plethora of evidence demonstrating that Mother continues to be unable to provide a safe and stable home for F.D. For example, two police officers with the Akron Police Department testified regarding frequent calls by Mother and others to Mother's home regarding noise complaints, violence in the home, and alleged break-ins. Mother reported that her boyfriend was physically violent with her. In addition, she told the police that people were entering her apartment and moving things around. The CSB caseworker testified that Mother exhibited delusional thoughts and that her behaviors had gotten worse with time. Mother told the caseworker that people had planted recording devices throughout her home, that someone paid her mailman to delay her mail, that people were harassing her because she refused to sell drugs and prostitute herself, that police officers and firefighters were coming to her home to tell her that she was beautiful, and that God had sent her on missions to find treasure and a missing girl.

{¶51} Mother was required by the case plan to address her mental health, substance abuse, and domestic violence issues. Despite diagnoses of bipolar disorder, intermittent explosive disorder, borderline personality disorder, and substance abuse disorder, Mother failed to engage in treatment services in any consistent manner. She would contact an agency, obtain an assessment, perhaps attend a session or two, and then cease engagement. Multiple mental health service providers terminated Mother from their programs due to Mother's lack of participation. She adamantly refused to consider psychotropic medications to manage her mental health symptoms.

**{¶52}** Mother participated in three or four parenting education programs, but she was never able to demonstrate an understanding of how to meet the needs of a child, particularly one with serious behavioral issues. As far as addressing domestic violence issues, Mother continued to maintain relationships with violent paramours and people who manipulated her. The CSB caseworker testified that Mother had not made any progress on any of her case plan objectives.

**{¶53}** Father, however, had only one case plan objective. He was required merely to maintain contact with the agency caseworker and keep her apprised of his interests regarding the child. The caseworker admitted that Father had maintained frequent contact with her and never wavered in his expressed desire to have a relationship with F.D. Moreover, Father established and maintained a relationship with the child through letters and phone calls.

**{¶54}** Father served an eight-year federal prison term for bank robbery. He admitted that he had made a stupid decision after falling on hard times. He expressed great remorse for his actions. Father testified that he used his time in prison for personal growth and to turn his life around so that he could care for F.D. Because of his good behavior, Father was transferred from a medium security facility to a lower level security facility. He worked various prison jobs and wrote a book that was published. He succeeded in negotiating a contract to write five additional books. He wrote twelve. Father was able to save $7,100 from his prison jobs and book royalties to use after he was released. He acquired a forklift operator's license while in prison so that he would have a skill to help him seek employment.

**{¶55}** Father was released from prison to a residential re-entry facility (a "halfway house") one week prior to the permanent custody hearing. He was permitted to look for a job and housing and testified that he could be released to home confinement in as little as three to four weeks. Father explained that "home confinement" meant simply that he would have to check in

with his parole officer regularly, but that he would be allowed to leave his home for work and to take care of all personal business. He testified that he planned to secure a home to accommodate the child. Father asserted that he did not have a girlfriend and that no one else would live in the home because he believed it was important to focus on caring for F.D.

{¶56} Father testified that he had been diagnosed with post-traumatic stress syndrome ("PTSD") in prison. He credited his prior attorney for advocating for him to receive a mental health assessment because of the trauma and abuse he had endured as a child in the child welfare system. Father consistently engaged in counseling in prison. It was so effective in helping him address his mental health issues that he was able to become a peer counselor and mentor to other inmates in the prison's suicide watch program. Father testified that he continues in counseling and recognizes the benefits of engaging in ongoing services. He would maintain F.D. in mental health services, support and monitor the child's use of prescribed medications, and would abide by the advice of the professionals because they understand things that Father as a layperson does not. Father demonstrated great insight regarding his PTSD, as well as the child's mental health issues, as Father testified that he exhibited the same aggressive behaviors as a child as F.D. exhibits. Father testified that he does not want F.D. to have the same experiences that he had as a child, suffering abuses and the trauma of moving from foster home to foster home; lacking stability, supervision, and support; and ultimately winding up in prison. Father emphasized his commitment to providing stability for the child.

{¶57} The only reservations expressed by the caseworker and guardian ad litem regarding placing the child with Father were Father's criminal history and the uncertainty as to when he would have attained his own stability and be able to care for the child. Father explained the circumstances that led him to engage in criminal behavior and the positive strides he had made to

address those issues and change his perspective and behaviors. In addition, Father testified regarding his current efforts to secure housing and employment. He explained that he would be able to have the child with him even while under home confinement. He testified that he understood the child's behavioral issues, recognized the need to maintain F.D. in services with medical and mental health professionals, and was committed to focusing on providing a stable home for the child. He recognized that a romantic relationship would be a distraction from that focus, and he intended to fully concentrate on meeting F.D.'s needs. Impressively, while he recognized the importance of facilitating a relationship between Mother and the child, Father testified that he was aware of Mother's mental health issues and he would consult with professionals for direction on how to preserve that relationship while protecting the child.

{¶58} The child's mental health worker at Ohio Guidestone testified that F.D. is close to entering the fourth and final phase at the residential treatment facility. In order to progress through the phases, a child must accrue a certain number of points based on behavior to "make his day [count]." Phase four requires 34 qualifying days in order for a child to phase out of the facility. While the mental health worker testified that F.D. was on track to phase out of Ohio Guidestone within 60 days, there were no definitive plans for his discharge yet. The child had made progress in regulating his emotions and reducing the number of physical acts of aggression during the past 13 months at the facility.[7] His psychotherapist testified that the need to physically restrain the child has significantly decreased over time. Specifically, while the child had to be restrained six and seven times, respectively, during the first two quarters, he only required restraint three times in the third quarter and once in the most recent quarter.

---

[7] The mental health worker testified that children typically phase out of Ohio Guidestone within six to nine months, although younger children like F.D. often need more time.

{¶59} Ohio Guidestone planned to review F.D.'s status in 45 days to determine whether it could identify a discharge date for the child. The psychotherapist testified that the facility team would likely recommend that F.D. be discharged to a therapeutic foster care setting with someone trained to handle children with disruptive behaviors. He admitted, however, that a parent could be trained to provide that type of environment. Because Ohio Guidestone had not yet determined when F.D. would be discharged, CSB had not begun to investigate therapeutic foster homes that might be available and capable of providing placement for the child. Notably, after the child's legal custody to Cousin disrupted, the agency placed him in a therapeutic foster home but that placement disrupted within a week due to the child's aggressive and destructive behaviors.

Applicability of R.C. 2151.414(E)(7)-(11) factors

{¶60} No evidence was presented to demonstrate that any of the factors in R.C. 2151.414(E)(7)-(11) are applicable here.

Conclusion

**{¶61}** Based on a thorough review of the record, this Court concludes that this is the exceptional case in which the trier of fact lost its way and committed a manifest miscarriage of justice by terminating the parents' parental rights and awarding permanent custody of F.D. to CSB. The evidence firmly established that Mother is not capable of providing safety, security, or stability for the child. However, Father has maintained a relationship with the child during the entire time of CSB's involvement, even though Father was serving a prison sentence. There is a significant bond between Father and the child who responds positively to Father's counsel and encouragement. F.D. wants to live with Father. Father took responsibility for his actions which resulted in his incarceration and took advantage of opportunities in prison for education and self-growth. He worked and saved a substantial amount of money, obtained a forklift operator's license so he would have a marketable skill, and consistently engaged in mental health services to address his childhood abuse and trauma. Father's testimony demonstrated insight into Mother's, the child's, and his own issues. He is committed to providing mentoring, stability, and all necessary care for the child. Father recognizes the ongoing need for professional services for both the child and himself.

**{¶62}** No other family members or third parties have indicated a desire and ability to seek legal custody of the child. No potential foster home has been identified. F.D. will eventually phase out of Ohio Guidestone. Father began seeking both housing and employment immediately upon his release to a halfway house. In addition, he immediately contacted Ohio Guidestone to set up a video visit with F.D. CSB did not identify any areas of concern or amend the case plan to require Father to engage in any services. Father exceeded the requirements of his sole case plan objective, maintaining regular contact with the caseworker and consistently reiterating his desire

to seek custody of the child. While Father had been released from prison only a week before the hearing, he already showed great initiative in taking steps to be able to provide a home for the child. Given that CSB had no definitive plans for the child's placement, that the child disrupted from every prior placement including therapeutic foster homes, that F.D. has a bond with Father and wants to live with him, and that Father has remained consistent in his commitment to the child, this Court concludes that the juvenile court's finding that permanent custody was in the best interest of the child is against the manifest weight of the evidence.

{¶63} We cannot sustain Mother's first assignment of error because she argues only that she is able to provide an appropriate home for the child. The clear and convincing evidence squarely demonstrates that Mother is not able to meet the child's needs. In addition, we have overruled Father's first assignment of error relating to the first prong of the permanent custody test. However, this Court sustains Father's second assignment error, as CSB did not present clear and convincing evidence that permanent custody is in the best interest of F.D. under the circumstances at this time. We clarify that the judgment awarding permanent custody of the child to CSB and terminating both Mother's and Father's parental rights is reversed.

III.

{¶64} Mother's three assignments of error are overruled. Father's first assignment of error is overruled. Father's second assignment of error is sustained. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed in part, reversed in part, and remanded for further proceedings consistent with this decision.

Judgment affirmed, in part,
reversed, in part,
and cause remanded.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to Mother and Summit County Children Services Board.

_____
DONNA J. CARR
FOR THE COURT

STEVENSON, J.
CONCURS.

FLAGG LANZINGER, J.
CONCURRING IN PART, AND DISSENTING IN PART.

{¶65} I concur in the majority's resolution of Mother's three assignments of error and Father's first assignment of error. I respectfully dissent, however, as to the majority's resolution of Father's second assignment of error, as I would conclude that the juvenile court's best interest finding underlying its award of permanent custody of F.D. to CSB is not against the manifest weight of the evidence.

**{¶66}** A reversal on the basis of manifest weight requires a conclusion that the juvenile court clearly lost its way and rendered a judgment resulting in a manifest miscarriage of justice. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. Based on a review of the evidence, I cannot conclude that this standard was met in this case.

**{¶67}** While Father made great strides to improve his psychological well-being and future opportunities for successful re-entry into public life during his incarceration, the fact remains that he was in prison for most of the child's life. Father was released to a halfway house less than a week before the permanent custody hearing. He testified that he might remain there up to nine months. Even if he found appropriate housing immediately, it would be at least three to four weeks before he would be released to home confinement, during which he would remain under various restrictions.

**{¶68}** Father testified that he would be on parole for three years. Although he speculated that he might be released from parole within nine months if he completed his re-entry program by that time, there was no evidence regarding the likelihood of his release by then. On the other hand, were Father to violate the terms of his parole, he would face the possibility of reincarceration. Should that occur, F.D. would again experience a custodial disruption and ongoing instability.

**{¶69}** F.D. has significant mental health issues which manifest as extremely disruptive behaviors and aggression. He requires a caregiver who understands his diagnoses and is skilled in techniques designed to de-escalate the child's inappropriate and violent reactions to common frustrations. While the child's psychotherapist from Ohio Guidestone agreed that a parent might be able to provide the necessary therapeutic environment for F.D., he testified that it would require "a lot of training." There was no evidence that Father, despite his good intentions and strong desire

to provide a home for the child, had the skills and understanding to address the child's special needs.

{¶70} Father never had the opportunity to provide consistent parenting for the child, given Father's incarceration for most of the child's life. Given his release from prison immediately prior to the permanent custody hearing, he was unable to demonstrate his parenting abilities or allow CSB to assess to determine whether Father required additional services. Had F.D. not already been in custodial limbo for four and a half years of his nine-year life at the time of the permanent custody hearing, granting additional time to allow Father to demonstrate that he was capable of providing a safe and stable home for the child might have been warranted. As the agency caseworker testified, however, it was unclear how long it would take before Father might be able to provide a home for F.D.

{¶71} I do not here belittle the efforts Father made with respect to his own rehabilitation. I further believe the Father loves F.D. and fervently desires to provide a home for the child. Unfortunately, the evidence established that even professionals well versed in the skills needed to care for the child struggled on many occasions. In fact, F.D. disrupted from therapeutic foster homes due to his violent and threatening behaviors. The evidence does not persuade me to believe that Father, with no training to address the child's mental health issues, is in a position to provide an appropriate home environment for F.D. in the foreseeable future.

{¶72} To prevail on his motion for legal custody, Father had to prove by a preponderance of the evidence that that disposition was in the best interest of the child. *See In re A.W.*, 9th Dist. Lorain No. 20CA011671, 2021-Ohio-2975, ¶ 11. Although he bore a lesser burden of proof than CSB to support its motion for permanent custody by clear and convincing evidence, I would conclude that Father failed to meet his burden. Evidence of Father's ability to provide permanence

for the child was speculative, at best. On the other hand, I believe that CSB proved by clear and convincing evidence that an award of permanent custody which would allow F.D. to reside with caregivers skilled in providing the necessary therapeutic environment is in the child's best interest. Accordingly, I would affirm the juvenile court's judgment.

APPEARANCES:

ANGELA KILLE, Attorney at Law, for Appellant.

JASON D. WALLACE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.

ALEXANDER HULL, Attorney at Law, for Appellee.

JOSEPH KERNAN, Guardian ad Litem.