DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Donna Castner, appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights to one of her two minor children and placed that child in the permanent custody of Summit County Children Services Board ("CSB"). Through the same order, the trial court placed Castner's older child in the legal custody of the paternal grandmother ("Grandmother"). We affirm.
 {¶ 2} Castner is the natural mother of N.P., born October 5, 1999, and H.P., born August 14, 2000. Both children were born with medical problems. N.P. was born with a cleft palate that later required several surgeries and involved some feeding issues and a need for speech therapy. H.P. was born with multiple congenital heart defects that have required, and will continue to require, multiple surgeries, daily medication, and ongoing care for the rest of her life. Due to her condition, H.P. requires special care and attendance at regular doctor's appointments. Her caregiver must also have the ability to recognize changes in her condition and respond appropriately. The children were removed from the home due to concerns that Castner was not adequately addressing her children's medical needs because she had her own mental health problems.
 {¶ 3} Castner stipulated that both children were dependent. With an initial goal of reunification, the requirements of her case plans included that she obtain a mental health assessment and follow recommended treatment, that she obtain stable housing, that she complete a course of parenting classes, and that she attend all of the children's medical appointments.
 {¶ 4} CSB eventually moved for permanent custody of H.P. and joined in Grandmother's motion for legal custody of N.P. Following a hearing on both motions, the trial court placed N.P. in the legal custody of Grandmother and placed H.P. in the permanent custody of CSB. The father of both children, F.P., surrendered his paternal rights as to H.P. and supported Grandmother's motion for legal custody of N.P., but he is not a party to this appeal. Castner appeals and raises two assignments of error.
 Assignment of Error I
"The trial court's award of permanent custody and grant of legal custody are not supported by sufficient credible evidence meeting the burden of clear and convincing evidence that permanent custody and legal custody to a relative was in the best interests of [H.P.] and [N.P.]"
 {¶ 5} Castner contends that the trial court erred in awarding permanent custody of H.P. to CSB and in awarding legal custody of N.P. to Grandmother. Because the children's placements involve distinct legal issues and their situations differ, we will address the two children separately.
 Permanent Custody of H.P. {¶ 6} Castner first contends that the trial court's decision to grant CSB's motion for permanent custody of H.P. was not supported by the evidence presented at the hearing. When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. In re Ozmun (Apr. 14, 1999), 9th Dist. No. 18983, at 3. In determining whether a criminal conviction is against the manifest weight of the evidence:
"The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 7} Moreover, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." Karches v. Cincinnati (1988), 38 Ohio St.3d 12, 19. Furthermore, "if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment." Id.
 {¶ 8} Before a juvenile court can terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least twelve months of the prior twenty-two months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also,In re William S. (1996),75 Ohio St.3d 95, 99.
 {¶ 9} The trial court found that the first prong of the permanent custody test was satisfied because H.P. had been in the temporary custody of CSB for more than twelve of the twenty-two months prior to the hearing. Castner has not challenged that finding but instead focuses her argument on the best interest prong of the permanent custody test.
 {¶ 10} When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must:
"[C]onsider all relevant factors, including, but not limited to, the following:
"(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and]
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C.2151.414(D)(1)-(4).[1]
 {¶ 11} Although Castner's attendance at visitation was fairly consistent and her visits with both children increased in frequency and duration over time, her caseworker stressed that visitation with H.P. had never progressed to unsupervised visitation because Castner had failed to complete parenting classes, attend all of H.P.'s medical appointments, or otherwise substantially comply with the requirements of her case plan. H.P. is a medically fragile child and CSB was not willing to risk her health, potentially even her life, in the unsupervised care of Castner until Castner proved her commitment and ability to monitor H.P.'s sensitive and ever-changing medical condition.
 {¶ 12} The evidence demonstrated that Castner appeared to love H.P. and that H.P. was always happy to see her and called her "Mommy." There was also evidence, however, that H.P. did not seem to be very upset when Castner failed to come to a scheduled visit, which happened on numerous occasions. CSB repeatedly modified visitation times to accommodate Castner's work schedule and, because Castner held twelve different jobs during the two-year period, all the changes were very disruptive to visitation. Nonetheless, after making the schedule changes, the foster mother and CSB aide would sometimes prepare H.P. for a visit, transport the medically fragile child to the visitation site, and Castner would simply fail to come without notice to anyone.
 {¶ 13} In addition to all the changes and failed visits, CSB and the guardian ad litem had concerns that Castner had continually violated visitation guidelines, such as by involving unauthorized people in the visits and by driving N.P. to visits when she did not have a driver's license or insurance.
 {¶ 14} H.P. has lived in the same foster home throughout this period. Her life is stable, she has been healthy, and she is doing well in that environment. The foster mother is a licensed emergency medical technician, has been a licensed foster mother for over thirteen years, and is certified to care for medically fragile children. H.P. interacts with both foster parents in a positive manner and the foster parents have worked diligently to address her medical needs.
 {¶ 15} Because H.P. was only two years old at the time of the permanent custody hearing, the guardian ad litem spoke on her behalf. She recommended that H.P. be placed in the permanent custody of CSB, reasoning that Castner could not meet the needs of H.P. on an ongoing basis. The guardian ad litem had spent two and a half years working with this family and had interviewed everyone involved in the case including the children's caregivers. The guardian stressed that she strongly believed in maintaining biological ties if at all possible, but she did not think that Castner had overcome her problems to the extent necessary to provide care for either of her children on a long-term basis.
 {¶ 16} The guardian, who indicated that she had twenty-one years of experience serving as a court-appointed special advocate for children, further indicated that she had never seen a case before where visitation was modified so many times and was "such a chaotic and convoluted issue." She explained that Castner repeatedly had to cancel or change scheduled visits. Although CSB tried to accommodate her, all that change was disruptive and not in the best interest of either child. The guardian ad litem believed that the caseworkers had gone above and beyond the call of duty to accommodate Castner.
 {¶ 17} The guardian ad litem concluded that Castner had failed to make significant progress toward reunification. In particular, she stressed that Castner continued to be deceptive and refused to follow rules, such as transporting N.P. when she did not have a driver's license and lying more than once on applications for government-subsidized housing; she continued to make poor decisions that negatively impacted herself and her children; and she did not put the needs of her children ahead of her own. The lack of stability in her life, in particular the frequent housing and job changes, posed a significant risk to the health of H.P., given H.P.'s delicate medical condition.
 {¶ 18} At the time the permanent custody hearing began, H.P. had been in the temporary custody of CSB for nearly two years. To be reunited with H.P., Castner had agreed to do several things including educating herself about H.P.'s condition and care by attending all of her medical appointments. The evidence at the hearing demonstrated that, of the ten appointments with H.P.'s cardiologist, Castner attended only two of them. The evidence did suggest that Castner may not have had notice of many of the child's visits to the pediatrician because they were due to illness and were scheduled on short notice. The appointments with the cardiologist, on the other hand, were scheduled well in advance. When Castner did attend an appointment, she was given a card with the time and date of the next appointment at that time. When Castner missed an appointment, the caseworker notified her of the next appointment by either a phone call or a letter. At the time of the hearing, Castner had not personally cared for H.P. for two years and all of the evidence indicated that H.P.'s condition was continually changing. Because she had missed so many of H.P.'s medical appointments, Castner admitted that she did not know much about H.P.'s current condition or medical care. Although Castner claimed to love H.P., she did not seem willing to commit herself to learning to handle her day-to-day needs.
 {¶ 19} Castner had been given two years but still had failed to complete other goals of her case plan including completing parenting classes. The caseworker explained that the parenting classes were aimed at training Castner to watch for, anticipate, and deal with signs of medical distress in H.P. Castner attributed her failure to complete a full course of classes to her changing work schedule. Castner changed jobs nearly a dozen times during this period. Several witnesses expressed concern that Castner had lived in seven different places and held twelve different jobs during this period. The evidence further demonstrated that Castner would likely be moving again because she had lied, for at least the second time during this period, on her application for government-subsidized housing. A witness representing her current landlord testified that Castner's misrepresentation on her application probably did jeopardize the status of her housing. Castner's lack of stability was further compounded by financial problems, including a debt that had grown to $34,000.
 {¶ 20} Castner also continued to deny that she had any unresolved mental health issues. Castner's current and past counselors testified that she was making progress in therapy on the objectives of her case plan, including her ability to manage her anger, solve problems, make sound decisions and understand the consequences of her actions. The guardian ad litem, however, stressed that the counselors had the roles of Castner's advocates and that they gauged her progress based on what Castner reported to them. Moreover, Castner had not attended counseling as scheduled but had cancelled almost half of her scheduled sessions. The guardian ad litem stressed, and the evidence demonstrated, that Castner continued to have problems that prevented her from caring for her children on a day-to-day basis.
 {¶ 21} Due to her fragile medical condition, H.P. is in need of a legally secure placement more so than a typical three-year-old. There are no relatives who have expressed a willingness to care for her on an ongoing basis. The evidence further demonstrated that Castner would not be an appropriate placement now or in the near future. Thus, the trial court could reasonably conclude that a secure placement could not be achieved without granting CSB permanent custody.
 {¶ 22} The trial court had ample evidence before it from which it could conclude that permanent custody to CSB was in the best interest of H.P.
 Legal Custody of N.P. to Grandmother {¶ 23} Several courts have noted that the juvenile court's disposition of legal custody to a relative is different from permanent custody to a children services agency because, among other things, it does not terminate parental rights but instead "leaves intact `residual parental rights, privileges, and responsibilities.'" In re Shepherd (Mar. 26, 2001), 4th Dist. No. 00CA12, quoting R.C. 2151.011(B)(17). Although there is no specific test or set of criteria set forth in the statutory scheme, courts agree that the trial court must base its decision on the best interest of the child. See In re Fulton, 12th Dist. No. CA2002-09-236, 2003-Ohio-5984, at ¶ 11.
 {¶ 24} Castner does not specifically argue that legal custody of N.P. to Grandmother was not in the child's best interest. We have reviewed the record, however, and conclude that the trial court did not err in determining that legal custody to Grandmother was in the best interest of N.P.
 {¶ 25} As detailed above, the evidence demonstrated that, because Castner had not resolved her problems with instability, she was not in a position to have custody of either of her children. Like H.P., although to a lesser degree, N.P. has medical issues that require ongoing care. Castner was required to attend N.P.'s medical appointments but she attended less than half of them. Castner's unresolved problems had particularly impacted N.P.: she has driven him in her car without a driver's license or insurance, she had visits with him in her home which continually changed, and she harassed Grandmother and her family, with whom N.P. resided. For example, Castner got into altercations with members of Grandmother's family, even right outside the residence while N.P. was inside, and she called the home so many times each day that the court ordered that phone contact be limited to one call each day, made by Grandmother to Castner.
 {¶ 26} Grandmother, on the other hand, had demonstrated that she could provide a stable home for N.P. on an ongoing basis. N.P. had been placed in her home for over two years and was doing well there. Grandmother had a fulltime job and had lived in the same home for over nineteen years. N.P. had benefited from a set routine in the home, he had successfully completed toilet training, and he attended speech therapy on a regular basis. While Grandmother was at work, either her daughter or one of her two nieces watched N.P. in Grandmother's home. Each caretaker followed the same daily routine that Grandma had established for N.P. Both the caseworker and guardian ad litem noted that there was a positive relationship between N.P. and Grandmother and that he was comfortable and integrated into the family. They both recommended that N.P. be placed in the legal custody of Grandmother. Unlike Castner, Grandmother had a stable environment, demonstrated in part by her long-term job and residence in the same home as well as by N.P.'s daily routine. Because Grandmother would be required to allow Castner to have visitation with N.P., the guardian ad litem further stressed that Grandmother had demonstrated a willingness to work with Castner where Castner, on the other hand, seemed to work against Grandmother.
 {¶ 27} Castner has failed to demonstrate that the trial court erred in placing N.P. in the legal custody of Grandmother. The first assignment of error is overruled.
 Assignment of Error II
"Because CSB failed to timely file its sunset dispositional motions, the trial court abused its discretion in considering issues and matter outside of the original complaints."
 {¶ 28} Through her second assignment of error, Castner contends that the trial court erred in considering matter outside the original complaint because CSB did not timely file its motion for permanent custody. It is fundamental, however, that "[a]n appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court."State v. Williams (1977), 51 Ohio St.2d 112, paragraph one of the syllabus. This court has read the entire record and it is devoid of any objection raised by Castner on this ground. Because Castner did not preserve this issue for appellate review, her second assignment of error is overruled.
 {¶ 29} The assignments of error are overruled and the judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
BAIRD, J. and BATCHELDER, J. CONCUR.
[1] The factor set forth in R.C. 2151.414(D)(5) is not relevant in this case.