DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, David A. ("Father"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that placed his minor child in the legal custody of a maternal aunt. We affirm.
 I. {¶ 2} Father is the natural father of A.A., born December 16, 1998. The child's mother, Kimberly Burd, voluntarily relinquished her parental rights and is not a party to this appeal. CSB first became involved in this case in October 2002 after being contacted by A.A.'s grandmother, who had been caring for A.A., but needed to leave town. Ms. Burd had left A.A. in the grandmother's custody while she allegedly received drug treatment for 30 days. Because Ms. Burd did not return at the end of that period, it was suspected that she was on a drug binge. CSB was unable to locate Ms. Burd and Father was incarcerated for violating probation on a nonpayment of child support charge, so CSB took custody of A.A.
 {¶ 3} CSB later moved for permanent custody of A.A. Following an evidentiary hearing, the trial court terminated Father's parental rights and placed A.A. in the permanent custody of CSB. This Court reversed that judgment on appeal because CSB had failed to establish that permanent custody was in the best interest of A.A. See In re A.A., 9th Dist. No. 22196, 2004-Ohio-5955.
 {¶ 4} Following remand to the trial court, CSB moved to have A.A. placed in the legal custody of his maternal aunt Tammy, who lives in Texas. Father also moved to have A.A. placed in his legal custody. Following a hearing on both motions, the trial court placed A.A. in the legal custody of his Aunt Tammy, with whom he had been residing for more than seven months. Father appeals and raises one assignment of error.
 II. A. Assignment of Error
"THE TRIAL COURT ABUSED ITS DISCRETION BY AWARDING LEGAL CUSTODY OF [A.A.] TO AN INTERESTED RELATIVE IN THAT [IT] WAS NOT IN THE BEST INTEREST OF [A.A.]"
 {¶ 5} Father contends that the trial court erred in placing A.A. in the legal custody of his maternal aunt. The juvenile court's disposition of legal custody to a relative is a less drastic disposition than permanent custody to a children services agency because it does not terminate parental rights but instead "leaves intact `residual parental rights, privileges, and responsibilities.'" In re Shepherd (Mar. 26, 2001), 4th Dist. No. 00CA12, at *20, citing R.C. 2151.011(B)(17). Also, the trial court's disposition of legal custody is not guided by clear statutory requirements. "Although there is no specific test or set of criteria set forth in the statutory scheme, courts agree that the trial court must base its decision on the best interest of the child." In reN.P., 9th Dist. No. 21707, 2004-Ohio-110, at ¶ 23, citing In re Fulton,
12th Dist. No. CA2002-09-236, 2003-Ohio-5984, at ¶ 11.
 {¶ 6} The trial court's determination that placing A.A. in the legal custody of his maternal aunt was in his best interest was supported by the following evidence. Both the guardian ad litem and the CSB caseworker opined that placing A.A. in the legal custody of his Aunt Tammy would be in his best interest. They explained that A.A. was doing very well in that placement, and emphasized the stability that A.A. had finally found in that home and that he was doing very well there, both academically and socially.
 {¶ 7} A.A.'s Aunt Tammy, with whom A.A. had been living for the seven months prior to the hearing, testified that A.A. has adjusted well to living in her home. She described A.A.'s progress in school since he started kindergarten, and indicated that he loves school and has made many friends, and that he had perfect attendance. She was pleased that A.A. was fitting in with his new classmates and had been invited to the birthday parties of three of his classmates.
 {¶ 8} Aunt Tammy indicated that she had attempted to maintain contact between A.A. and his Ohio relatives and, as part of that effort, she had a cell phone with Akron's "330" area code so that family members could call A.A. in Texas without incurring long distance phone charges. She further stated that she was willing to facilitate visits between A.A. and his family members and his father, as long as the visits were appropriate.
 {¶ 9} Additionally, Aunt Tammy lives with her fiancé, both are employed, and they own a new home together. They have no children and have devoted themselves to caring for A.A. and have incorporated him into their family. Aunt Tammy spoke lovingly about A.A. as she detailed some of the activities they enjoyed together and described his bedroom, which is decorated with a sports theme because A.A. is an avid sports fan.
 {¶ 10} CSB approved Aunt Tammy's home as a long-term placement for A.A. after the home was visited and approved by the children services agency in Texas and the criminal records of both Aunt Tammy and her fiancé were screened. A social worker in Texas had been working with the family and recommended that A.A. stay with Aunt Tammy because he was doing so well there.
 {¶ 11} On the other hand, the evidence before the trial court concerning a potential placement of A.A. with Father was not favorable. A.A. had not lived with his father for two years and, during that time, Father had taken few steps toward remedying the conditions that caused A.A. to be removed from the home.
 {¶ 12} The caseworker expressed her concerns about A.A. living with Father, emphasizing that Father lacks stable housing or employment or other structure in his life, and he has a history of drug use and violence. Although Father testified that he had suitable housing and that he no longer used drugs, much of the evidence before the trial court contradicted those contentions and Father offered nothing to corroborate his self-serving testimony.
 {¶ 13} In fact, Father's own testimony demonstrated that he had not even admitted that he had problems as a parent. Father minimized his problems and attempted to blame others for his situation. Father blamed most of his problems on A.A.'s mother, Kimberly Burd, and insinuated that all of his problems had been resolved because he ended his long-time relationship with Ms. Burd. Father also minimized his problems by stating that the only times that he was violent were the two times when he was charged and convicted of criminal offenses. He also claimed that the only time that he used drugs in the past five years was the one time that he tested positive for cocaine. He later elaborated on that testimony with the hard to believe statement that he had tested positive for cocaine that one time not because of voluntary drug use but because Ms. Burd must have slipped drugs into his food.
 {¶ 14} Father's sister, with whom A.A. had resided for 21 months, testified that she was much more comfortable with A.A. residing with his Aunt Tammy than with Father, emphasizing the long history of violence and drug use in Father's relationship with A.A.'s mother. She described Father as having a "short fuse" and stated that she has been afraid of him before because of his temper. Father's sister explained that, although she loves her brother, she has concerns about him having custody of A.A. and she would not even leave the two alone together while A.A. was living in her home.
 {¶ 15} Father's sister also testified that A.A. had a very unstable life while he lived with his parents. She described A.A. when he first came to live with her after his removal from his parents' custody, and indicated that he did not like to be touched, had nightmares, and would often wet the bed because he did not think he was allowed to leave his bed to go to the bathroom.
 {¶ 16} Ms. Burd, who voluntarily relinquished her parental rights, testified about what A.A.'s life had been like before he was removed from his parents' custody. She described their home, a maintenance room in a bingo hall, as being filled with drug use and violence. She and Father used crack cocaine on a daily basis and they often used crack in the presence of A.A. She testified that A.A. would even recognize the "dope man's" vehicle when he came to the bingo hall to make a drug deal with them.
 {¶ 17} Ms. Burd also testified that Father continually abused her verbally and physically and that A.A. had witnessed the violence. She also testified that Father was very controlling and would not let her go anywhere alone. Ms. Burd finally concluded that she did not believe that Father could meet A.A.'s needs and that A.A. should be placed with his Aunt Tammy, emphasizing that he "finally has a stable life and a peaceful life."
 {¶ 18} Although the prior condition of A.A.'s home is relevant only insofar as it reflects the current home environment that Father would provide for A.A., there was little before the trial court to indicate that Father has made changes to his life. Father claimed to have complied with some of the requirements of his case plan, but he never allowed CSB to verify any of his claims. He would not sign releases to enable CSB to get records from any of the service providers and he had not allowed CSB workers into the home that he recently rented to conduct a home study. Thus, as far as CSB and the trial court could determine, Father had not taken any substantial steps toward remedying the conditions that caused A.A. to be removed from the home. Although Father had submitted urine samples that tested negative for the presence of drugs, he had done so for only the two weeks prior to the hearing, despite being ordered to do so months earlier.
 {¶ 19} Given the evidence before it, the trial court could reasonably conclude that it was in the best interest of A.A. to place him in the legal custody of his Aunt Tammy. The assignment of error is overruled.
 III. {¶ 20} Father's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
Whitmore, P.J. Moore, J. concur.