[Cite as *In re M.A.*, 2024-Ohio-808.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: M.A.

C.A. No.     30781

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 21 08 0688

DECISION AND JOURNAL ENTRY

Dated: March 6, 2024

HENSAL, Judge.

{¶1}   Appellant Mother appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that placed her child in the legal custody of the maternal grandparents ("Grandmother," "Grandfather," and collectively "Grandparents").   This Court affirms.

I.

{¶2}   Mother and Father are the biological parents of M.A., born May 17, 2021.   The parents were never married.   Father is a convicted sexual offender and was not permitted to have contact with any children as a condition of his parole.   Accordingly, he has never developed a relationship with the child.   He has not appealed the juvenile court's judgment.

{¶3}   Mother tested positive for marijuana at the child's birth and exhibited some mental health concerns which brought the child to the attention of Summit County Children Services Board ("CSB" or "the agency").   Although M.A. was discharged into Mother's care upon his release from the hospital, CSB implemented three successive in-home safety plans to address

concerns for the child's well-being. After the third in-home safety plan failed, the agency implemented an out-of-home safety plan whereby M.A. stayed in Grandparents' home and Mother was allowed to visit with the child but not spend the night. Ultimately, CSB filed a complaint alleging that the child was dependent and sought an emergency order of temporary custody to Grandparents under the protective supervision of the agency.

{¶4} Mother and Father appeared at shelter care, waived their rights to a hearing, and stipulated to a finding of probable cause for the child's removal from their custody. They agreed to emergency temporary custody to Grandparents under CSB's protective supervision. The juvenile court granted Mother supervised visitation.

{¶5} Following an adjudicatory hearing, the magistrate found that M.A. was a dependent child, citing Mother's serious mental health issues, including hallucinations; and the failure of three safety plans because of Mother's inattention to the child in circumstances that put him at risk. Mother did not file an objection, and the juvenile court adopted the magistrate's decision as its order.

{¶6} Mother and Father waived their rights to the initial dispositional hearing. They stipulated to the agency's use of reasonable efforts. They further agreed to the child's placement in the temporary custody of Grandparents under CSB's protective supervision and to the juvenile court's adoption of the agency's case plan as an order. Mother's case plan objectives included basic needs, mental health, and parenting education components.

{¶7} Neither parent attended the first review hearing, although each was represented by counsel. The magistrate found that both the caseworker and guardian ad litem proposed more intensive and hands-on parenting instruction to address Mother's lack of parenting skills. Mother did not object to that factual finding. The juvenile court maintained the child's custody status.

{¶8} After the second review hearing, the magistrate found that Mother was participating in mental health counseling but had not engaged in the recommended parenting education, did not have suitable housing, and had missed a substantial number of visits during the prior two months. M.A. remained in Grandparents' temporary custody under the agency's supervision.

{¶9} Eleven months into the case, CSB moved for legal custody to Grandparents. Mother filed a motion for legal custody, or, alternatively, for a six-month extension of temporary custody. Father did not file a motion regarding the child's custody.

{¶10} After a three-day dispositional hearing, the magistrate found that Mother had not made significant progress on her case plan objectives and that it was in the child's best interest to be placed in Grandparents' legal custody and terminate CSB's protective supervision. Mother filed a timely objection, challenging the magistrate's factual findings. CSB responded in opposition.

{¶11} The juvenile court overruled Mother's objection, finding that Mother had failed to prove by clear and convincing evidence the statutory factors required to grant an extension of temporary custody. The trial court found that awarding legal custody of M.A. to Grandparents and terminating the agency's protective supervision was in the best interest of the child. Mother was granted supervised visitation with M.A. Mother timely appealed and raises one assignment of error for review.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT REFUSED TO GRANT A FIRST SIX-MONTH EXTENSION OR LEGAL CUSTODY OF THE CHILD TO MOTHER AND INSTEAD GRANTED LEGAL CUSTODY TO MATERNAL GRANDPARENTS BECAUSE THAT DECISION WAS NOT IN THE BEST INTEREST OF THE CHILD, AGAINST THE MANIFEST WEIGHT

OF THE EVIDENCE, AND WAS NOT SUPPORTED BY A PREPONDERANCE
OF THE EVIDENCE.

{¶12} Mother argues that the juvenile court's judgment that denied her dispositional motions and instead awarded legal custody of M.A. to Grandparents is against the manifest weight of the evidence. This Court disagrees.

Manifest weight: legal custody

{¶13} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal citations and quotations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

> On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence. Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest.

(Internal citations and quotations omitted.) *In re M.F.*, 9th Dist. Lorain No. 15CA010823, 2016-Ohio-2685, ¶ 7.

{¶14} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12. The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal

custody on the best interest of the child. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18, quoting *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23. In that regard, the juvenile court is guided by the best interest factors enumerated in Revised Code Section 2151.414(D) relating to permanent custody. *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17.

{¶15} The best interest factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in Section 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 9th Dist. Summit Nos. 26976 and 26977, 2014-Ohio-2748, ¶ 16. In addition, the juvenile court may also look to the best interest factors in Section 3109.04(F)(1) for guidance. *In re K.A.*, 9th Dist. Lorain Nos. 15CA010850 and 15CA010860, 2017-Ohio-1, ¶ 17. While some factors overlap with those above, others include the child's adjustment to his or her environment; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio. R.C. 3109.04(F)(1).

{¶16} CSB removed M.A. from Mother's custody the month following the child's birth.[1] M.A. resided with Grandparents since he was about ten days old. He was 15 months old when the legal custody hearing commenced. During that time, Mother visited only sporadically with the child, preventing her from progressing beyond the need for supervision during her interactions with the child.

---

[1] The agency's first case was dismissed and refiled due to statutory time restrictions.

{¶17} M.A. shares a strong bond with Grandparents. The child is happy and comfortable in their care, in the only home he has effectively ever known. The child is also bonded to Mother whose interactions with him are generally appropriate. The caseworker testified that Mother remains uneasy or uncomfortable, however, when the child is fussy or requires soothing.

{¶18} Due to the child's young age, the guardian ad litem made a recommendation for custody in the child's best interest. She opined that legal custody to Grandparents was appropriate to meet the child's needs. The guardian ad litem did not support an extension of temporary custody given Mother's inconsistency and lack of progress on her case plan objectives.

{¶19} Because M.A. has spent his entire life in custodial limbo, the child requires permanence. He has some special needs, including two club feet and speech delays, which Grandparents have addressed consistently and appropriately. Moreover, Grandparents provide a safe, financially secure, and stable home for M.A.

{¶20} On the other hand, Mother has struggled throughout the case to address the concerns underlying the child's removal from her care. Mother engaged in mental health counseling but was terminated after failing to maintain contact with the mental health provider. Although she reestablished contact and reengaged with her counselor, she had not gained the insight or developed the coping skills necessary to mitigate the impact that her mental health issues had on her ability to provide a safe and stable home environment for M.A.

{¶21} Mother struggled to meet her own basic needs during the pendency of the case. During those 15 months, Mother moved six times. Although Father was prohibited from having contact with any child due to his status as a child sexual offender, Mother lived in two homes with Father during the case. She most recently lived with a male friend and his child, while she continued to look for independent housing. Although she testified that her friend would allow her

to live with him as long as necessary, Mother hoped to find an apartment closer to where she was working because she did not have a car and relied on public transportation. At the time of the hearing, Mother did not have the financial resources to secure such housing.

{¶22} Although Mother claimed to work throughout the case, she never provided verification of employment or income to the agency. The caseworker and guardian ad litem both understood that Mother virtually provided spiritual readings through an online company, although they believed that Mother did not earn a significant income from that work. In addition, Mother worked at one point at an entertainment club, but it appeared that she was later only providing such services virtually.

{¶23} Mother began working at a bar and claimed she was earning more than $100 per hour, although she did not testify as to how many hours she worked each week. The caseworker was not aware that Mother had started working at a bar, and Mother admitted she had not told the caseworker about her recent employment. By the third day of the hearing, Mother testified that her employment had changed again. While she claimed she was still working at bars, it appeared she was involved with a consortium of various establishments that allowed her to choose where she would work at any given time. Mother provided no verification of income but testified that she had made $600 the prior weekend. Notwithstanding Mother's claim of lucrative employment, she testified that she could not yet afford to pay rent, buy a car, or even purchase a new pair of sneakers she needed.

{¶24} Mother testified that she worked evenings. She believed that a friend in another city would be willing to provide childcare for M.A. during that time, but that would necessitate Mother's relocation to that city. Although she was looking for an apartment there, she could not yet afford to move.

{¶25} Mother had not prioritized visiting with M.A. During the last three months of the case, Mother attended only three visits when she was scheduled to have at least 24. She testified that the prospect of seeing Grandfather during visits made her ill because he had abused her as a child. She also testified that she suffered abuse at the hands of both Grandparents. Mother provided no details regarding the abuse. CSB investigated those allegations early in the case and found them to be unsubstantiated. The guardian ad litem testified that Mother had mentioned an incident involving the shower but also reported that Grandfather had not touched her inappropriately. Nevertheless, Mother made vague references to "gross things that nobody should do to people that are their kid" and excused her failure to visit because seeing Grandfather triggered her trauma. The juvenile court, with agreement from the agency, admitted a letter from Mother's counselor into evidence based on Mother's assertion that it clarified her diagnoses and the progress she was making in treatment. The letter made no reference to Mother having been abused by her parents as a child.

{¶26} Initially, Grandmother supervised Mother's visits. Grandfather began supervising when Grandmother no longer felt safe around Mother. While Mother testified that her rift with Grandmother began when Grandmother commented during a visit that Mother was not prioritizing the child's needs, Grandmother testified that it arose when Mother brought Father to a visit at a park and attempted to hide him in her car. Grandmother called the caseworker and guardian ad litem to ask what she should do because Father was not allowed to have contact with the child. Both testified that they told her to end the visit. After she did, Mother began harassing and threatening Grandmother, indicating that she wanted to kill Grandmother. Both the caseworker and guardian ad litem testified that they had seen Mother's texts to Grandmother and posts on social media referencing Mother's desire to see Grandmother dead.

{¶27} Mother later refused to allow Grandfather to supervise her visits and insisted that they be moved to a private visitation center. The caseworker made a referral to Common Ground. Grandfather immediately completed his intake there, while Mother delayed completing hers, further delaying some visits.

{¶28} Grandmother and Grandfather testified that they understand that Mother's residual parental rights include the right the reasonable visitation with the child. Both explained the opportunities they have offered for Mother to visit with M.A. twice a week. They testified that they have and will continue to facilitate Mother's visitation with the child, including expanding visits to encompass longer periods of time a couple weekends a month. While Grandfather did not think that Mother should have to pay to visit with the child, he would respect Mother's choice to visit at Common Ground. Grandparents also agreed that a friend Mother identified was appropriate to supervise visits.

{¶29} The agency required Mother to participate in parenting education. Although she argues that the case plan did not specify the need for intensive parenting classes, Mother testified that she was aware of that requirement, and she never objected. The caseworker made a referral to Ohio Guidestone upon Mother's request, but Mother did not pursue that referral in a timely manner. When she finally did contact Ohio Guidestone, they had a waiting list for services. The caseworker made a referral to Ever Well but when she realized there was a waiting list there too, she made a referral to Bellefaire where Mother could start parenting classes immediately. Mother waited three months to contact Bellefaire which, by that time, had a waiting list. The caseworker then made a referral to The Bair Foundation which could have assigned Mother a parenting instructor at that time. After Bair attempted to contact Mother on multiple occasions without success, it sought help from CSB to facilitate contact. The caseworker told Mother that Bair was

trying to set up her intake appointment. By the time Mother reached out to Bair, that provider too had a waiting list.

**{¶30}** Within a month, Bair was able to offer Mother services. By the time of the hearing, Mother had completed her intake but had not begun any one-on-one sessions involving the child.

**{¶31}** Based on a thorough review of the record, this is not the exceptional case in which the trier of fact clearly lost its way and committed a manifest miscarriage of justice by awarding legal custody of M.A. to Grandparents. The preponderance of the evidence established that Grandparents are willing and able to provide a safe and stable home for the child, as they had since M.A. was less than two weeks old. They were meeting all the child's basic and special needs. Grandparents also demonstrated their commitment to facilitating visitation between Mother and the child.

**{¶32}** Mother had neither consistently addressed her mental health issues nor developed the insight or coping skills to overcome the impact those issues had on her ability to attain stability. She failed to establish safe and stable housing, planning to move a seventh time when she could afford to leave her friend's home. Mother changed jobs regularly without keeping the caseworker or guardian ad litem apprised of her current situation. She never provided verification regarding employment and income despite ongoing requests by the caseworker.

**{¶33}** Despite concerns underlying the child's removal that Mother lacked the skills to parent the child on a regular, fulltime basis and manage both M.A.'s basic and special needs, Mother did not pursue the intensive parenting education she knew was requested. She waited months on occasion to contact service providers to initiate classes. By the conclusion of the three-day hearing, Mother had not yet begun parenting sessions involving the child.

{¶34}   As the child is in a safe and secure home with the only caregivers he ever knew, his needs are fully met, Mother has the opportunity for regular and reasonable visitation, and Mother has neither made progress on her case plan objectives nor demonstrated the ability to provide an appropriate permanent home for M.A., the juvenile court's finding that an award of legal custody to Grandparents is not against the manifest weight of the evidence.

Six-month extension of temporary custody

{¶35}   Mother further argues that the juvenile court erred by not granting a first six-month extension of temporary custody to allow her additional time to continue to work on her case plan objectives.  As previously stated, the juvenile court must resolve a motion for legal custody solely in consideration of the best interest of the child.  *In re K.H.*, 2016-Ohio-1330, at ¶ 12.  It is well settled that "'[w]here the trial court finds that it is in the best interest of a child to be placed in legal custody as a permanent disposition, the trial court must necessarily deny any extension of temporary custody.'"  *In re B.C.*, 9th Dist. Summit Nos. 26976 and 26977, 2014-Ohio-2748, ¶ 22, quoting *In re C.M.*, 9th Dist. Summit No. 24380, 2009-Ohio-943, ¶ 24.  As legal custody of M.A. to Grandparents is in the child's best interest, an extension of temporary custody necessarily is not.

{¶36}   Moreover, before the juvenile court may grant a first six-month extension of temporary custody, it must find by clear and convincing evidence not only that the extension is in the best interest of the child, but also that there has been "significant progress" on the case plan objectives, and there is reasonable cause to believe reunification would occur within the extension period.  R.C. 2151.415(D)(1).  As explained above, Mother made very limited progress in addressing her case plan objectives.  Her housing remained unstable, and her income was unverified.  Although she was participating in mental health counseling, she did not appear to recognize its purpose or importance, testifying that it is "helpful for what it is, but I don't think it's

an end all be all." She had not begun to address her allegations of childhood abuse with her counselor, leaving the juvenile court with unconfirmed evidence of Mother's claims of impropriety in contravention of the agency's finding after investigation that Mother's allegations were unsubstantiated. Finally, Mother had not engaged in the required parenting education when the hearing began. By the third day of the hearing, she had completed her intake appointment but had not yet scheduled any sessions including the child.

{¶37} Given the supported finding that legal custody to Grandparents is in the child's best interest, coupled with Mother's lack of significant progress in addressing her case plan objectives to remedy the conditions underlying the child's removal, the juvenile court did not err by denying Mother's motion for an extension of temporary custody. For the above reasons, Mother's assignment of error is overruled.

III.

{¶38} Mother's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

––––––

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period

for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
JENNIFER HENSAL
FOR THE COURT

SUTTON, P. J.
FLAGG LANZINGER, J.
CONCUR.

APPEARANCES:

JAYSEN W. MERCER, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

HOLLY FARAH, Guardian ad Litem.