[Cite as *In re C.M.*, 2024-Ohio-1966.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: C.M.
      C.M.

C.A. Nos.     30665, 30666

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.    DN 22-06-0576
              DN 22-06-0577

DECISION AND JOURNAL ENTRY

Dated: May 22, 2024

CARR, Presiding Judge.

{¶1}    Appellant Mother appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that placed her children in the legal custody of Appellee Father. This Court affirms.

I.

{¶2}    Mother and Father are the biological parents of C.M. (hereinafter "Ca.M."), born August 29, 2011; and C.M. (hereinafter "Ce.M."), born September 30, 2014. The parents were never married, and it appears that the children were at all times prior to the cases below in the legal custody of Mother. Mother filed a case in domestic relations court in June 2021, to provide clarity for the parents regarding visitation. In October 2021, Father obtained his first formal visitation order, granting him six hours of parenting time per week. When the domestic relations court closed the case in December 2021, it finalized the visitation order, granting Father parenting time on

Fridays after school until Monday morning every other week, as well as one evening for dinner each week.

{¶3} In October 2021, Summit County Children Services Board ("CSB" or "the agency") opened cases regarding the children based on concerns regarding drugs and a loaded gun in Mother's home. CSB did not remove the children from Mother's home at that time. The agency closed those cases in February 2022, after Mother tested negative for drug use three times and the gun was no longer in her home.

{¶4} On June 22, 2022, CSB filed complaints alleging that the children were abused and dependent based on reported domestic violence by Mother's then-boyfriend and a May 2022 positive drug screen indicating Mother had used methamphetamine. The agency removed the children from Mother's home and placed them in Father's home under an order of protective supervision. After a shelter care hearing, the magistrate granted Mother four hours of unsupervised visitation each week as long as her drug screens were negative.

{¶5} At adjudication, Mother and Father waived their rights to a hearing and stipulated that the children were dependent. The agency dismissed its allegations of abuse and deleted references in the complaints to the children's exposure to domestic violence in Mother's home.

{¶6} On September 2, 2022, the parties gathered for disposition. Mother and Father again waived their rights to a hearing and stipulated to the following orders. Ca.M. and Ce.M. were placed in the temporary custody of Father under the protective custody of CSB. Mother and Father would alternate a specified half-week unsupervised visitation schedule, exchanging the children in the parking lot of a designated business. Each parent was entitled to one phone call per day when the children were with the other parent. Mother and Father had to follow all recommendations made by the children's medical providers. The parents would communicate

through the Talking Parents app, replying to each other in a timely and respectful manner. The juvenile court adopted the agency's case plan as an order.

{¶7} The case plan required Mother to engage in counseling after a referral by CSB based on her diagnoses of anxiety, depression, and post-traumatic stress disorder; and to obtain a chemical dependency assessment, follow all recommendations, and submit to random drug screens. The case plan required the children to continue counseling at Red Oak. Given its lack of concerns regarding Father's home environment, CSB created no case plan objectives for Father.

{¶8} After Mother tested positive for methamphetamine on September 9, 2022, CSB moved to limit Mother to supervised visitation until she showed consistent progress in addressing her substance abuse issues and established a pattern of negative drug screens. The magistrate granted the agency's motion.

{¶9} In November 2022, Father filed a motion for legal custody, asserting he and the children shared a profound bond and he was able to meet the children's basic needs. Later that month, Mother moved for legal custody under the agency's protective supervision, asserting she had substantially complied with her case plan objectives and was able to meet the children's basic needs.

{¶10} On November 28, 2022, the magistrate held a hearing on the parents' respective motions. CSB did not file a dispositional motion, although the assistant prosecutor informed the magistrate that the agency supported Father's motion. After the hearing, the magistrate issued a decision granting Father's motion for legal custody and terminating the agency's protective supervision. Mother filed timely objections.

{¶11} The juvenile court overruled Mother's objections. Although it acknowledged the parents' strained relationship and the recommendation by the guardian ad litem to maintain CSB's

supervision to allow Mother and Father to engage in services designed to address that issue, the trial court granted legal custody of the children to Father and terminated the agency's involvement. It further ordered that Mother could have supervised visitation as Father and she might agree. Mother timely appealed and raises one assignment of error for review.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT ERRED AND ABUSED THEIR DISCRETION WHEN THEY GRANTED LEGAL CUSTODY TO FATHER AND DENIED MOTHER'S MOTION FOR AN EXTENSION OF TIME.

{¶12} Mother argues that the juvenile court erred by awarding legal custody of the children to Father and terminating the agency's protective supervision in lieu of maintaining the status quo to allow the parties to address ongoing concerns. This Court disagrees.

On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence. Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest. Thus, our standard of review is whether a legal custody decision is against the manifest weight of the evidence.

(Internal citations and quotations omitted.) *In re M.F.*, 9th Dist. Lorain No. 15CA010823, 2016-Ohio-2685, ¶ 7.

{¶13} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations omitted.) *Eastley v. Volkman*,

132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶14} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12. The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18, quoting *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23. In that regard, the juvenile court is guided by the best interest factors enunciated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17. Those factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 9th Dist. Summit Nos. 26976 and 26977, 2014-Ohio-2748, ¶ 16.

{¶15} In addition, the juvenile court may also look to the best interest factors in R.C. 3109.04(F)(1) for guidance. *In re K.A.*, 9th Dist. Lorain Nos. 15CA010850 and 15CA010860, 2017-Ohio-1, ¶ 17. While some factors overlap with those above, others include the child's adjustment to his or her environment; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio. R.C. 3109.04(F)(1).

{¶16} While it appears that the children were in Mother's legal custody prior to the initiation of these cases in June 2022, Father maintained a relationship with them throughout their lives. The parents utilized an informal visitation schedule until the domestic relations court established an interim schedule in June 2021. When that case ended in December 2021, the domestic relations court ordered that Father would have the children every other weekend from Friday until Monday, plus one evening each week.

{¶17} Prior to that formal visitation order, Father testified he was "very involved" with the children. In fact, the parents agreed that Ca.M. lived with Father a substantial part of the time during the two years the child attended kindergarten. In addition, Ca.M. stayed overnight at Father's home on school nights during first grade, which ensured that the child arrived at school on time. Mother agreed that the children were with Father while they attended school remotely during the pandemic lockdown. She admitted that Father did a good job facilitating the children's remote education and that they did well during that time.

{¶18} At the time of their removal from Mother's home and placement into Father's, Ca.M. was ten years old and Ce.M. was seven. They were eleven and eight years old, respectively, at the time of the hearing. Ce.M. had been diagnosed with fetal alcohol spectrum disorder ("FASD") and medical professionals were in the process of determining where she fell on the spectrum. Because Ca.M. also exhibited symptoms of FASD, he was scheduled to meet with a specialist in a few months to verify the diagnosis. While no one clarified the symptomology of FASD or its effect on the children, there was evidence that both children struggle to settle into new routines and Ca.M. exhibits a myriad of behavioral issues. He becomes easily defiant and aggressive.

{¶19} Mother has struggled to manage Ca.M.'s behavior. The child easily overpowers her. The children were routinely late to school while in her care. Mother testified that she believed Ca.M tried to be late for school while with her because he knew that Father would only hold Mother accountable. On the other hand, Father was able to establish daily and bedtime routines which the children follow. Only rarely were the children late to school while with Father.

{¶20} The children attend counseling and Ca.M. is working with a psychiatrist to find a combination of medications to help manage his behavior. Father engages in family counseling with the children. While Mother was also expected to participate, the counselor barred her from attending sessions after Mother arrived for her first session and engaged in inappropriate behavior. The caseworker testified that the counselor was not willing to include Mother in any sessions until she attained sobriety and was able to control her outbursts.

{¶21} While there are some struggles between Mother and Ca.M., the child loves Mother and wants to spend time with her. He also wants to spend time in Father's home, where he has a good relationship with Father, Father's girlfriend, and the five other children in that home. Both children have acclimated well to living with Father.

{¶22} The guardian ad litem reported that Ca.M. wants to be able to spend time with both Mother and Father. Ce.M. was more focused on playing with various electronic devices and never expressed a preference to the guardian ad litem regarding custody. The guardian ad litem testified that, while he could not say that Father's home was inappropriate for the children, he recommended maintaining the status quo, i.e., placement of the children with Father under the agency's protective supervision, to give the parents additional time to work on ameliorating their hostility to one another. Everyone agreed that Mother's and Father's strained relationship has a negative impact on the children.

{¶23} The children have experienced some disruptions and uncertainty during their lives. Although CSB did not remove them from Mother's home in 2021, their circumstances lacked some stability as the agency worked informally with Mother to address her substance abuse issues and unsanitary conditions in the home over the course of four months. After CSB closed its voluntary case with Mother, another county's child welfare agency got involved due to deplorable home conditions and Mother's ongoing substance abuse. Shortly thereafter, CSB removed the children from Mother's home and placed them with Father based on their investigation, which indicated that Father's home was safe and appropriate. Although the juvenile court rendered a final dispositional order and closed the case in just over nine months, when it might have extended the time to allow Mother to continue to work on her case plan objectives, the children deserve the stability and security that only comes with permanency.

{¶24} Mother's case plan objectives included obtaining a drug and alcohol assessment and following all recommendations, including submitting to drug screens; addressing domestic violence concerns; and maintaining a home free from clutter and animal waste. Mother completed the domestic violence objective and the agency had no further concerns in that regard. Her home was no longer in a deplorable condition and most of the animal feces had been removed. The children reported that some animal waste was still present but Mother was confining her pets to limited areas of her home, mitigating that issue.

{¶25} Mother admitted previously having a "quite extensive issue with alcohol," but she testified she stopped drinking three years ago. She later began using methamphetamine and had been using it for about a year at the time of the hearing. Mother agreed that she "[o]bviously" has a drug use problem and has not "made great decisions on that[.]" She tested positive for

methamphetamine use during the cases and stopped participating in counseling or other drug abuse treatment.

{¶26} Mother's most recent positive drug screen occurred around the same time she ceased counseling. Mother testified that the counseling sessions were not helpful because they focused largely on her past trauma which made her feel uncomfortable. She testified in fact that she does not see a connection between mental health and substance abuse issues. Accordingly, she had not begun to confront the issues that compelled her to turn to drugs to help her cope with stressors. Nevertheless, Mother testified that she would re-engage in counseling if the court were to maintain the status quo and keep the cases open.

{¶27} The caseworker addressed additional concerns regarding Mother's substance abuse. She testified that Mother reported she had also been diagnosed with attention deficit hyperactivity disorder ("ADHD") and that she used methamphetamine to manage those symptoms. The caseworker expressed concern that Mother chose to use an illegal and dangerous substance to address her ADHD instead of seeking legitimate and monitored medical treatment. Moreover, the caseworker testified that Mother did not appear to understand the serious ramifications of using a substance like methamphetamine, particularly how it could impact her ability to provide a safe and stable home for the children.

{¶28} The children are secure and accustomed to living full-time in Father's home. The environment provides routine and stability. Father ensures the children arrive at school on time. He facilitates their counseling sessions and medical appointments. He has been actively engaged with teachers and advocated for services on the children's behalf.

{¶29} There was no evidence of any concerns when Father earlier had biweekly, weekend visits, plus one evening each week with the children. The caseworker testified that the agency has

not observed any issues in Father's home that raise concerns for the safety or well-being of the children. She denied the agency was rushing to close the cases. Rather, she cited CSB's policy of supporting parents who, like Father, have actively demonstrated the ability to care for their children without the need for ongoing agency involvement or intervention.

{¶30} Everyone agreed that Mother and Father have a long-term contentious relationship and that the parents' adversarial interactions negatively impact the children. To alleviate the need for direct contact, the parents use a parental communications application. Father testified that he plans to continue to use it to keep Mother apprised of information regarding the children. In addition, both parents agreed that Mother has had the opportunity for regular visits with the children during the cases. Father testified that he would continue to facilitate Mother's visitation.

{¶31} Based on a thorough review of the record, this is not the exceptional case in which the trier of fact clearly lost its way and created a manifest miscarriage of justice by awarding legal custody of the children to Father and terminating CSB's protective supervision. "'When considering the parties' motions for legal custody, the trial court was required to hold each moving party to his or her respective burden of proof.'" *In re R.S.*, 9th Dist. Summit Nos. 30498 and 30499, 2023-Ohio-2224, ¶ 46, quoting *In re A.W.*, 9th Dist. Lorain No. 20CA011671, 2021-Ohio-2975, ¶ 17. Accordingly, each parent maintained the burden of proving by a preponderance of the evidence that legal custody to either Mother or Father was in the children's best interest.

{¶32} Father met his burden of proof. He demonstrated that he was able to consistently meet the children's basic needs and provide a safe and stable home for them. Father did not require the agency's services before providing appropriate care for Ca.M. and Ce.M., and CSB's ongoing involvement with the family is not necessary to ensure the children's continuing well-being. Moreover, legal custody to Father serves to maintain the children in a suitable parent's home.

{¶33} On the other hand, Mother failed to meet her burden of proving that legal custody to her under the agency's protective supervision is in the children's best interest. She conceded that she is struggling with substance abuse issues, although her discussions with the caseworker indicated that she does not understand the gravity of methamphetamine use. Mother stopped participating in counseling because she found it unhelpful. However, she has not been able to attain and maintain an extended period of sobriety on her own. She recognized that she was not yet ready to provide an appropriate home for the children. As Father was willing and able to do so, Mother did not demonstrate that it was in the children's best interest to delay their permanency. *See In re J.M.*, 9th Dist. Summit 30258, 2022-Ohio-3638, ¶ 32 (Where legal custody is in the children's best interest, an extension of temporary custody necessarily is not.).

{¶34} This Court acknowledges that the guardian ad litem recommended maintaining the children in Father's temporary custody under the agency's supervision for some additional time to allow Mother and Father to work to resolve their vitriolic relationship. However, the consensus of the parties was that the parents' relationship was irreparably strained. The children may long be emancipated before Mother and Father have developed the skills to interact cordially. The key issue in considering legal custody motions is the best interest of the children, not how to facilitate an amicable relationship between the parents. The best interest of the children demands permanence and stability irrespective of Mother's and Father's feelings towards each other. Father has facilitated Mother's visits with the children and testified he will continue to do so. Mother may seek court intervention if Father later fails to honor her residual parental rights. In the meantime, Ca.M. and Ce.M. are healthy, safe, and secure with Father. Accordingly, the juvenile court's award of legal custody to Father is not against the manifest weight of the evidence. Mother's assignment of error is overruled.

III.

**{¶35}** Mother's sole assignment of error is overruled.  The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

STEVENSON, J.
CONCURS.

FLAGG LANZINGER, J.
DISSENTING.

{¶36} I respectfully dissent. I would conclude that the juvenile court's award of legal custody of the children to Father at this early stage of their cases is against the manifest weight of the evidence.

{¶37} Mother argues that the juvenile court's award of legal custody of Ca.M. and Ce.M. to Father, in lieu of granting her legal custody under CSB's protective supervision or maintaining the status quo for an additional time, is contrary to the best interest of the children. I agree with Mother that Father did not meet his burden of proving by a preponderance of the evidence that terminating the agency's protective supervision and closing the cases was appropriate at this time.

{¶38} The children's cases were open for only five months at the time of the hearing. The case plan had only been in effect for just over two months. Despite an awareness of the significance of the parents' volatile and antagonistic relationship and the negative effect that had on the children, CSB failed to develop any case plan objectives for Father. During the time that the children were in Father's temporary custody, he restricted Mother's contact with the children. The agency did little to nothing to help maintain the children's relationship with Mother. While purportedly providing reunification efforts to Mother, CSB agreed to allow Mother to terminate her participation in her only extant objective and then used that against her to describe her case plan compliance as minimal.

{¶39} The guardian ad litem strongly advocated for maintaining the status quo to allow Mother a reasonable time to address her relatively recent use of methamphetamine. He expressed concern that the agency had not developed any case plan objectives for Father, given the paramount problem presented by the parents' volatile relationship which negatively impacted the children's well-being and interfered with Mother's ability to enjoy a relationship with them.

{¶40} All parties emphasized the contentious, disrespectful, antagonistic, and uncooperative relationship of the parents. Despite the short reunification efforts period, the caseworker believed there was no hope for improvement. The guardian ad litem opined that the relationship likely would not improve without the intervention of additional services, including parenting classes and family counseling. Mother repeatedly acknowledged the need for co-parenting services and her willingness to engage in those. In the limited time during which CSB was involved, it failed to require Father's participation in such services.

{¶41} The children had spent most of their lives in Mother's care. During their time in Father's temporary custody, they were comfortable in his home, but behavioral and academic issues continued, indicating the need for ongoing adjustments. Father acknowledged Ca.M.'s struggles in particular, referencing the child's "little black hole of misery." Mother had difficulties getting Ca.M. to cooperate with her attempts to get the children to school on time. Father, too, was unsuccessful in that regard on occasion. Moreover, Ca.M. was retained for a second year in kindergarten after having been in Father's care during the first year. Accordingly, Father's care and supervision of the children was not a panacea to remedy all concerns.

{¶42} In the short time these cases pended before the juvenile court, Father established a pattern of interfering with and restricting Mother's contacts and relationship with the children. For example, he dictated the weekly day and window of time for visitation with no room for flexibility to allow the children to attend events with Mother's extended family. Leaving all future visitation decisions to Father's exclusive discretion would likely strain the Mother-child bond with the children further.

{¶43} It continues to dismay me when CSB initiates a dependency/neglect/abuse case, yet fails to file a final dispositional motion for the juvenile court's consideration, as occurred in these

cases. The caseworker testified that the agency had not planned to file a custody motion at that point in the cases. The guardian ad litem testified that there would be no repercussions with maintaining the status quo for another seven months to give the parents a full year to address concerns. Although the caseworker testified that the agency supported legal custody to Father to provide stability for the children, she admitted that they would maintain stability if Father's temporary custody and agency oversight continued.

{¶44} For the reasons articulated above, I would conclude that Father failed to meet his burden of proof to demonstrate that termination of CSB's protective supervision was in the best interest of Ca.M. and Ce.M. The juvenile court's award of legal custody to Father without ongoing agency oversight was premature, particularly given the parents' volatile relationship that negatively impacted the children's well-being; no case plan objectives for Father; and the extremely limited time available to Mother to address her substance abuse issue, especially as all her drugs screens during the past month were negative for drug use. Accordingly, I believe that the juvenile court's judgment awarding legal custody to Father and terminating CSB's protective supervision is against the manifest weight of the evidence. I would sustain Mother's sole assignment of error and reverse the juvenile court's judgment.

APPEARANCES:

JASON D. WALLACE, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and C. RICHLEY RALEY, JR., Assistant Prosecuting Attorney, for Appellee.

SCOTT DYE, Attorney at Law, for Appellee.

DANIEL R. BACHE, Guardian ad Litem.